Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2020 08:08 AM CDT

State of Nebraska, appellee, v.
Lorenzo Montoya, appellant.
___ N.W.2d ___

Filed April 17, 2020.    No. S-19-660.

1. **Criminal Law: Courts: Appeal and Error.** In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeals, and its review is limited to an examination of the record for error or abuse of discretion.

2. \_\_\_\_: \_\_\_\_: \_\_\_\_. When deciding appeals from criminal convictions in county court, an appellate court applies the same standards of review that it applies to decide appeals from criminal convictions in district court.

3. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination.

4. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

5. **Judges: Evidence: Appeal and Error.** An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on the sufficiency of a party's foundation for admitting evidence.

6. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection.

7. **Constitutional Law: Witnesses: Appeal and Error.** An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error.

8. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

9. **Search and Seizure: Evidence: Trial.** Evidence obtained as the fruit of an illegal search or seizure is inadmissible in a state prosecution and must be excluded.

10. **Constitutional Law: Criminal Law: Police Officers and Sheriffs: Investigative Stops: Search and Seizure: Words and Phrases.** The investigatory stop is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning; it is considered a "seizure" sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime.

11. **Constitutional Law: Criminal Law: Police Officers and Sheriffs: Arrests: Search and Seizure: Probable Cause.** Arrests are characterized by highly intrusive or lengthy search or detention, and the Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime.

12. **Probable Cause: Words and Phrases.** Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause.

13. **Investigative Stops: Police Officers and Sheriffs: Probable Cause.** Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances and must be determined on a case-by-case basis.

14. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.

15. **Investigative Stops: Motor Vehicles.** The witnessing of a driving violation, however minor, is sufficient to support a stop.

16. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Probable Cause.** Reasonable proof of the accuracy of the radar equipment indicating to the law enforcement officer that the defendant was speeding need not be demonstrated in order to support reasonable suspicion for a stop of the vehicle for speeding.

17. ____: ____: ____: ____. The appropriate inquiry for an investigatory stop for speeding is whether a reasonable police officer had a minimal level of objective justification for the belief that speeding had occurred.

18. **Trial: Evidence: Motions to Suppress: Waiver: Appeal and Error.** A failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and a party will not be heard to complain of the alleged error on appeal.

19. **Blood, Breath, and Urine Tests: Drunk Driving: Evidence: Proof.** The four foundational elements which the State must establish by reasonable proof as foundation for the admissibility of a breath test in a driving under the influence prosecution are as follows: (1) that the testing device was working properly at the time of the testing, (2) that the person administering the test was qualified and held a valid permit, (3) that the test was properly conducted under the methods stated by the Department of Health and Human Services, and (4) that all other statutes were satisfied.

20. **Administrative Law: Blood, Breath, and Urine Tests: Records: Proof.** Where the records of the maintenance of a machine are relied on to prove that the machine was properly maintained for purposes of providing foundation for breath test results, the records admitted at trial must show by satisfactory evidence that the inspections complied with all requirements of title 177, chapter 1, of the Nebraska Administrative Code.

21. **Administrative Law: Appeal and Error.** The construction of the regulations is a matter of law in connection with which an appellate court has an obligation to reach an independent determination regardless of the ruling of the court below.

22. **Administrative Law.** For purposes of construction, a rule or regulation of an administrative agency is generally treated like a statute.

23. **Statutes: Appeal and Error.** An appellate court will not resort to interpretation to ascertain the meaning of statutory words that are plain, direct, and unambiguous.

24. **Statutes: Legislature: Intent.** A collection of statutes pertaining to a single subject matter are in pari materia and should be conjunctively

considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.

25. **Statutes.** It is impermissible to follow a literal reading that engenders absurd consequences where there is an alternative interpretation that reasonably effects a statute's purpose.

26. **Administrative Law: Blood, Breath, and Urine Tests: Proof.** Amended certificates of analysis to correct clerical errors provide satisfactory evidence that the inspections of an approved breath testing device complied with the requirements of title 177 of the Nebraska Administrative Code.

27. **Constitutional Law: Hearsay.** Only testimonial statements cause the declarant to be a witness within the meaning of the Confrontation Clause.

28. **Rules of Evidence.** Unless the regularly conducted activity of a business is the production of evidence for use at trial, business records are not testimonial.

29. **Constitutional Law: Hearsay: Blood, Breath, and Urine Tests.** Neither original simulator solution certifications relating to maintenance of breath testing devices nor amended certifications are testimonial for purposes of the Confrontation Clause, because the simulator solution certifications are prepared in a routine manner without regard to any particular defendant.

30. **Sentences: Appeal and Error.** Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits.

31. ____: ____. Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

32. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

33. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

34. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's

demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

35. **Sentences: Rules of Evidence.** The sentencing phase is separate and apart from the trial phase, and the traditional rules of evidence may be relaxed following conviction so that the sentencing authority can receive all information pertinent to the imposition of sentence.

36. **Sentences: Evidence.** A sentencing court has broad discretion as to the source and type of evidence and information which may be used in determining the kind and extent of the punishment to be imposed, and evidence may be presented as to any matter that the court deems relevant to the sentence.

37. **Sentences.** It is permissible for a sentencing court to consider the information that a defendant has been charged with but not yet tried for allegedly illegal acts committed after the offense for which the defendant is being sentenced.

38. **Drunk Driving.** Whether or not there are passengers in a vehicle, driving under the influence presents a serious threat to public safety.

39. **Sentences: Appeal and Error.** It is not the function of an appellate court to conduct a de novo review of the record to determine whether a sentence is appropriate.

Appeal from the District Court for Lancaster County, Andrew R. Jacobsen, Judge, on appeal thereto from the County Court for Lancaster County, Thomas E. Zimmerman, Judge. Judgment of District Court affirmed.

Joe Nigro, Lancaster County Public Defender, and Sarah J. Safarik, for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.
## NATURE OF CASE
The defendant appeals his conviction and sentence for driving under the influence, which were affirmed on intermediate appeal to the district court. The defendant argues that the

county court should have granted his motions to suppress challenging his stop for lack of reasonable suspicion, his arrest for lack of probable cause, and the results of the test of his breath alcohol content because the machine used was not at the time of its calibration accompanied by a certificate of analysis of the wet bath solutions containing the name of the person who actually tested the solutions as required by the rules and regulations of Nebraska's Department of Health and Human Services. Amended certificates of analysis were later obtained, which listed the correct name of the person who tested the solutions. The defendant also asserts that the evidence was insufficient to support his conviction and that his sentence was excessive.

## BACKGROUND

Lorenzo Montoya was charged in the county court for Lancaster County with one count of operating a motor vehicle while under the influence, in violation of Neb. Rev. Stat. § 60-6,196 (Reissue 2010), by operating or being in actual physical control of a motor vehicle while under the influence of alcoholic liquor or of any drug or when he had "a concentration of eight-hundredths of one gram or more by weight of alcohol per two hundred ten liters of his or her breath," on or about March 12, 2017. Montoya was also charged with having one or more prior convictions under Neb. Rev. Stat. § 60-6,197.02 (Cum. Supp. 2018), having committed one prior offense in November 2008 and another in April 2008.

### Stop and Arrest

At trial, Trooper Michael Thorson of the Nebraska State Patrol testified that he first observed Montoya's vehicle on March 12, 2017, at approximately 1:50 a.m., traveling in front of him going the same direction. Montoya's vehicle appeared to be traveling faster than the 35-mile-per-hour speed limit. Thorson also observed the vehicle cross over the center line. According to Thorson, the road was curved, but the weather and road conditions were normal.

Thorson waited until the vehicle was at a good location for radar detection and used his radar to detect the vehicle's speed. Thorson testified that he is trained at estimating speeds and is certified in the operation of radar devices. Thorson testified that, as required, he had checked his radar at the beginning of his shift on March 12, 2017, with tuning forks to ensure it was working properly. The radar displayed that the vehicle was traveling at 50 miles per hour.

Thorson initiated a traffic stop. Montoya was the driver of the vehicle. There were passengers in the front passenger seat and in the back. When Thorson approached the stopped vehicle, he immediately detected a distinct odor of alcoholic beverage. He noticed that Montoya's eyes were bloodshot and glossy, which Thorson explained was "typical for someone who's been drinking."

Thorson asked Montoya to sit in the passenger seat of the police cruiser, where Thorson administered a horizontal gaze nystagmus test. Thorson testified that it is his usual practice to conduct this test inside his police cruiser in order to eliminate outside distractions such as lights. Thorson described that he and Montoya faced each other during the test. Thorson testified that Montoya demonstrated six out of six of the possible clues the test looks for. According to Thorson, observation of four out of the six impairment clues indicates a high probability that the individual "is under the influence of alcohol at a .10 or above." Observing more clues indicates that the individual has an even higher breath alcohol concentration.

Thorson also conducted the walk-and-turn test on Montoya. Thorson testified that Montoya exhibited two out of two of the standardized clues for intoxication during the instructional phase of the test and five out of eight of the clues during the walking phase of the test. According to Thorson, demonstrating only two out of these eight clues is considered failing the test.

After conducting the horizontal gaze nystagmus and the walk-and-turn tests, Thorson asked Montoya if he wished to participate in the one-legged stand test. Montoya declined.

Montoya had initially reported to Thorson during the stop that he had consumed only one "tall boy." Montoya later reported during the stop that, between 11:30 p.m. and 1:45 a.m., he had consumed three "tall boys," each containing 24 to 32 ounces of beer.

Thorson arrested Montoya and took him to a nearby facility where Montoya's breath alcohol content could be tested by a DataMaster machine. The DataMaster tests a sample of a person's breath with an infrared detector to determine a person's breath alcohol content. The test was conducted approximately 1 hour after Montoya's last reported drink. Thorson followed the appropriate checklist to ensure proper operation of the test. The test showed that Montoya had a concentration of .134 of a gram of alcohol per 210 liters of breath.

Thorson testified that he is trained in driving under the influence investigation and certified in performing a DataMaster test. He has 12 years of experience in which he has conducted approximately 3,000 driving under the influence investigations. Thorson opined that Montoya was under the influence of alcohol when he operated his motor vehicle on March 12, 2017.

## DataMaster

Officer Grant Powell testified at trial that he is the DataMaster maintenance supervisor for Lancaster County. He conducted the inspections and calibration check of the DataMaster that tested Montoya's breath sample.

The purpose of calibration verification is to ensure that the DataMaster machine is accurately reading the alcohol content of breath samples. Rules and regulations of the Department of Health and Human Services, which appear in title 177 of the Nebraska Administrative Code, require that calibration must occur within 40 days prior to the subject sample. Powell described that the process utilized by Lancaster County law enforcement and approved under title 177 involves two tests with wet bath water and alcohol mixtures, one containing a target value of .080 and the other of .150. The solutions produce

a vapor at the target values when heated to the approximate temperature of exhaled breath.

The wet bath simulator solutions used by Lancaster County law enforcement are provided by a company in North Carolina, RepCo Marketing (RepCo). When shipped, the simulator solutions are accompanied by certificates of analysis which contain information required by the regulations, including the name of the person who prepared, tested, and supplied the solution.

Powell conducted an inspection of the DataMaster subsequently used to test Montoya's breath alcohol content within the required 40-day period. The digital display, operational lights, operational condition, and printer all passed their required testing. Powell testified that the DataMaster machine used to test Montoya's breath sample was calibrated within the required 40-day period and that it passed both the internal check and the wet bath solution check. Powell signed a certification so reflecting.

Powell elaborated that the DataMaster in question was calibrated using simulator solutions from lots 16801 and 16104, which were accompanied by certificates of analysis from RepCo certifying that the solutions were accurate for their target values. The certificates of analysis originally accompanying the simulator solutions stated that a RepCo employee, Alma Palmer, had prepared, tested, and supplied the simulator solutions contained in those lots. On April 19, 2018, Powell became aware that the person who had tested the solutions in lots 16801 and 16104 was not the person whose name appeared on the certificates of analysis. On May 7, RepCo sent amended certificates of analysis for those lots stating that a RepCo employee, Colby Hale, not Palmer, was the person who had prepared, tested, and supplied the simulator solutions. The amended certificates were created to put the person's name on them who had actually tested those solutions. Nothing else in the amended certificates was different from the original certificates of analysis.

Powell testified that he had no concerns about the accuracy of the target values for the simulator solutions in lots 16801 and 16104 or about whether the solutions were working correctly when he conducted the relevant calibration of the DataMaster used to conduct the test on Montoya's breath sample. Powell noted that the solutions were tested not just at RepCo, but also by a separate company. Further, the solutions were run through four different DataMaster machines, each with their own unique internal reference standards, and the solutions did not test outside of the 5-percent margin of error on any of the four machines.

Powell noted that the "test card" for Montoya's breath sample showed a normal breath flow rate, a successful blank test and internal standard check, two analyses of the breath sample without any noted errors, and then another successful blank test. Powell testified that in his professional opinion the DataMaster utilized to test Montoya's breath alcohol content was in proper working order on the date of the test, March 12, 2017.

## Motion to Suppress Evidence Obtained as Result of Stop

Before trial, on October 31, 2017, Montoya had moved to suppress all fruits of the stop of his vehicle that was allegedly without reasonable suspicion or probable cause, in violation of the 4th and 14th Amendments to the U.S. Constitution, article 1, section 7, of the Nebraska Constitution; and Nebraska statutes.

Thorson's testimony at the pretrial hearing on the motion largely mirrored that given at trial. He testified in more detail regarding his training in the operation of the radar and how the radar in his police cruiser works. He described the annual, more sophisticated calibration test of his radar.

Thorson testified at the pretrial hearing that Montoya's vehicle was 300 to 500 feet ahead of him when he first saw it. Thorson was traveling the speed limit and saw the vehicle getting further and further away from him. There were no

other vehicles in the area. Thorson testified that it was his usual practice to visualize the speed of a vehicle before taking a Doppler reading and to put that in his report. Thorson noted that "[f]or whatever reason," he did not include his visual estimation of Montoya's speed in his report, and that therefore, "I'm not going to sit up here and speculate as to what my visual estimation was at the time." Thorson testified that a "good Doppler tone" is a consistent high-pitched noise, which indicates that there are no outside influences such as obstacles or bad weather interfering with the device's readings. There was a good Doppler tone when he took the radar reading of Montoya's vehicle.

The court overruled the pretrial motion to suppress. At the beginning of trial, Montoya asked for a standing objection based on an alleged lack of reasonable suspicion for the stop, which the court granted. Also, during Thorson's testimony at trial, Montoya renewed his objection to any admission of evidence derived from the stop. The trial court overruled the renewed objections.

## Motion to Suppress Evidence Obtained as Result of Arrest

Montoya had also moved before trial to suppress all evidence resulting from his warrantless arrest, because law enforcement lacked probable cause and, therefore, the arrest violated Montoya's rights under the 4th and 14th Amendments to the U.S. Constitution; article 1, § 7, of the Nebraska Constitution; and Nebraska statutes.

At the pretrial hearing on the motion, Thorson did not dispute defense counsel's assertion that the National Highway Traffic Safety Administration training manual specifies that the horizontal gaze nystagmus test shall be conducted while the subject is standing. Thorson testified, however, that during his training course he was told it would not negatively impact the validity of the test if the subject was seated rather than standing.

Thorson further testified at the pretrial hearing that after Montoya failed the horizontal gaze nystagmus test and the walk-and-turn test, he had Montoya sit in his vehicle for a 15-minute observation period before administering a preliminary breath test. Thorson checked Montoya's mouth both at the beginning and at the conclusion of the observation period. At the conclusion of the observation period, Thorson asked Montoya if he had regurgitated any stomach fluid, belched, eaten anything, or put anything into his mouth while Thorson was not looking. Montoya responded that he had burped. Thorson asked Montoya if he had regurgitated "any type of stomach fluid whatsoever" when he burped, and Montoya answered that he had not. Thorson then administered the preliminary breach test, which showed a breath alcohol content of .176.

Thorson explained that it is not part of the mandatory protocol for the observation period to ask whether the subject has regurgitated stomach fluid or belched. Thorson explained that it was his understanding based on consultations with others in law enforcement that burping without regurgitating stomach fluid does not affect the test. Thorson agreed with defense counsel, however, that it could impact the test if the subject burped up something that was not solid like vomit or regurgitation, and which contained alcohol. Thorson testified that if the subject in any way indicates that something may have come up out of the subject's stomach, then he restarts the observation time.

Defense counsel argued that the results of the horizontal gaze nystagmus test could not support probable cause because Montoya was not standing during the test. Further, recorded conversation in the video, wherein Thorson asked Montoya to "[t]ry to straighten your head out," indicated there were issues with Montoya's being positioned correctly for the test. Defense counsel also argued that the preliminary breath test could not create probable cause because Montoya had burped. Though Montoya had indicated upon Thorson's questioning that he had

not "regurgitated in his mouth," Montoya had elaborated that he would have let it out and not swallowed it, had he done so. According to defense counsel, this exchange did not eliminate the possibility that something had come up into Montoya's mouth that could have impacted the test. According to defense counsel, without the results of the preliminary breath test and the horizontal gaze nystagmus test, the remaining indicia of impairment observed by Thorson would be insufficient to establish probable cause.

The court overruled the pretrial motion to suppress. At trial, Montoya did not renew the motion to suppress the fruits of the arrest for an alleged lack of probable cause.

## Motion to Suppress Datamaster Results for Lack of Foundation

In a separate motion, Montoya had also moved before trial to suppress the results of the DataMaster breath test for the reason that the test was administered without proper compliance with Neb. Rev. Stat. §§ 27-104 and 29-822 (Reissue 2016) and 60-6,201 (Reissue 2010), as well as title 177. The pretrial motion specifically challenged the DataMaster results on the ground that the 40-day check of the DataMaster was conducted without valid certificates of analysis for either lot 16801 or lot 16104, because the certificates of analysis falsely listed Palmer as the person who tested the solutions. The evidence presented at the pretrial hearing was similar to that at trial. The court overruled the motion.

At the beginning of trial, Montoya asked for a standing objection based on the failure of the certificates of analysis to comply with title 177, which was granted. Montoya renewed his objection at trial during the admission of the results of Montoya's breath test, on the grounds that (1) the DataMaster test was out of compliance with title 177, (2) the amended certificates contained inadmissible hearsay and were not business records because they were not created near the time of the event, and (3) the failure to have Hale available for

cross-examination violated the Confrontation Clause. The court again overruled the motion.

## Verdict and Sentence

Montoya was found guilty. At the sentencing hearing, the court found that Montoya had two prior convictions of driving under the influence, making this his third offense. The State noted at sentencing that Montoya had been arrested twice since March 12, 2017, the date of the underlying offense; once for driving under the influence and the other time for driving during revocation and false reporting. Defense counsel brought to the court's attention the fact that Montoya had recently received a diagnosis of "alcohol use disorder" and that he had an upcoming job interview. Defense counsel also pointed out that Montoya had not yet been convicted of the charged crimes relating to the arrests occurring after March 12.

The trial court noted that it was giving "consideration" to the charges Montoya was currently facing, "which certainly you haven't been convicted of." The court sentenced Montoya to a jail term of 180 days, a fine of $1,000, and a 15-year license revocation with the ability to apply for an interlock device permit.

## Appeal to District Court

Montoya appealed to the district court, assigning that the county court erred in overruling his three motions to suppress, in finding the evidence sufficient to support the jury's verdict, and by imposing an excessive sentence. The district court affirmed the conviction and sentence. Montoya appealed to the Nebraska Court of Appeals, and we moved the case to our docket.

## ASSIGNMENTS OF ERROR

Montoya assigns that the district court erred by (1) affirming the county court's order that denied his motion to suppress fruits of the stop, (2) affirming the county court's order that

denied his motion to suppress fruits of his arrest, (3) affirming the county court's order that denied his motion to suppress the DataMaster results for lack of foundation, (4) finding sufficient evidence to support Montoya's conviction, and (5) finding that Montoya's sentence was not excessive.

## STANDARD OF REVIEW

[1] In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeals, and its review is limited to an examination of the record for error or abuse of discretion.[1]

[2] When deciding appeals from criminal convictions in county court, we apply the same standards of review that we apply to decide appeals from criminal convictions in district court.[2]

[3] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination.[3]

[4] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[4]

[5] We review for abuse of discretion a trial court's evidentiary rulings on the sufficiency of a party's foundation for admitting evidence.[5]

---

[1] *State v. McCave*, 282 Neb. 500, 805 N.W.2d 290 (2011).

[2] *Id.*

[3] *State v. Hartzell*, 304 Neb. 82, 933 N.W.2d 441 (2019).

[4] *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018).

[5] *Id.*

[6] Apart from rulings under the residual hearsay exception, we review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate determination to admit evidence over a hearsay objection.[6]

[7] An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error.[7]

[8] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[8] The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[9]

## ANALYSIS

Montoya asserts that the district court erred by affirming the county court's orders denying his motions to suppress the fruits of the stop, to suppress the fruits of the arrest, and to suppress the DataMaster test results for lack of foundation. He also asserts that there was insufficient evidence to support his conviction and that his sentence was excessive. We disagree with Montoya's arguments and affirm the judgment of the district court.

---

[6] *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008).

[7] *State v. Smith*, 302 Neb. 154, 922 N.W.2d 444 (2019).

[8] *State v. McCurdy*, 301 Neb. 343, 918 N.W.2d 292 (2018).

[9] *Id.*

## Motions to Suppress Under
## Fourth Amendment

[9] Montoya's motions to suppress the fruits of the stop and to suppress the fruits of the arrest were brought under the Fourth Amendment. Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.[10] Evidence obtained as the fruit of an illegal search or seizure is inadmissible in a state prosecution and must be excluded.[11]

There are three tiers of police encounters under Nebraska law.[12] The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning.[13] This type of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection.[14] Only the second and third tiers of police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution.[15]

[10] The second category, the investigatory stop, as defined by the U.S. Supreme Court in *Terry v. Ohio*,[16] is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning.[17] This type of encounter is considered a "seizure" sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to

---

[10] *State v. Hartzell, supra* note 3.

[11] *Id.*

[12] *State v. Schriner*, 303 Neb. 476, 929 N.W.2d 514 (2019).

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[17] *State v. Schriner, supra* note 12.

give rise to reasonable suspicion that a person has committed or is committing a crime.[18]

[11] The third type of police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or detention.[19] The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime.[20]

The stop of Montoya's vehicle after the radar detected he was speeding was a second-tier encounter. Montoya argues that the evidence was insufficient to support reasonable suspicion for the stop because Thorson did not memorialize in his police report his visual estimation of Montoya's traveling speed and because his radar gun could, in theory, have malfunctioned. We find no merit to this argument.

[12-14] Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause.[21] Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances and must be determined on a case-by-case basis.[22] When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.[23]

[15] The witnessing of a driving violation, however minor, is sufficient to support a stop.[24] Although we have held that the accuracy of the radar equipment must be demonstrated in order to support a conviction for speeding—if the evidence was based

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017).

[22] *Id.*

[23] *State v. Piper*, 289 Neb. 364, 855 N.W.2d 1 (2014).

[24] See *State v. Barbeau*, 301 Neb. 293, 917 N.W.2d 913 (2018).

on the radar readings[25]—we have never held that a police report containing a preradar visual estimation of speed is necessary to demonstrate such accuracy. Rather, reasonable proof that the particular radar equipment employed on a specific occasion was accurate and functioning properly is all that is required.[26]

[16,17] More to the point, reasonable proof of the accuracy of the radar equipment indicating to the law enforcement officer that the defendant was speeding need not be demonstrated in order to support reasonable suspicion for a stop of the vehicle for speeding.[27] The appropriate inquiry for an investigatory stop for speeding is whether a reasonable police officer had a minimal level of objective justification for the belief that speeding had occurred.

Thorson testified that he had checked his police cruiser's radar device at the beginning of his shift to ensure it was working properly, he waited until the best moment to take the radar reading, there was a good Doppler tone, and the radar read that Montoya was driving 50 miles per hour in a 35-mile-per-hour zone. This provided ample circumstances demonstrating that the stop was based on more than an inchoate and unparticularized hunch.

We conclude, like the county court and the district court on intermediate appeal, that the radar reading gave Thorson reasonable suspicion to stop Montoya's vehicle for speeding. We find it unnecessary to reach the question of whether Thorson's observation of the vehicle crossing the centerline also supported reasonable suspicion for the stop. And Montoya does not challenge the continuation of the second-tier detention based on Thorson's observations that led him to administer the field sobriety tests. The county court did not err in overruling Montoya's motion to suppress the fruits of the stop, and the district court did not err in affirming that ruling.

---

[25] See *State v. Snyder*, 184 Neb. 465, 168 N.W.2d 530 (1969).

[26] *State v. Kudlacek*, 229 Neb. 297, 426 N.W.2d 289 (1988).

[27] See *Taylor v. Wimes*, 10 Neb. App. 432, 632 N.W.2d 366 (2001).

Montoya also asserts on appeal that the fruits of the third-tier encounter, the arrest, should have been suppressed because Thorson lacked probable cause. Montoya argues that Thorson lacked probable cause to arrest him for driving under the influence because Montoya was seated while Thorson performed the horizontal gaze nystagmus, there was no video of Thorson's administering the horizontal gaze nystagmus test to confirm it was performed correctly, and Thorson did not know if Montoya had regurgitated anything containing alcohol during the observation period for the preliminary breath test.

[18] Montoya did not preserve this error for appellate review. A failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and a party will not be heard to complain of the alleged error on appeal.[28]

## Foundation for DataMaster Results and Confrontation Clause

Montoya next argues that the county court should have granted his motion to suppress the DataMaster test results, because the certificates of analysis accompanying the calibration solutions originally did not contain the name of the person who actually tested them. Montoya argues that the test results were thus supported by insufficient foundation because there is no authority under title 177 for amended certificates and the amended certificates did not "accompany" the solutions in strict compliance with title 177.[29] He also argues that the admission of the amended certificates violated the Confrontation Clause because he had no opportunity to confront Hale.

[19] The four foundational elements which the State must establish as foundation for the admissibility of a breath test in a driving under the influence prosecution are as follows: (1) that the testing device was working properly at the time of the

---

[28] *State v. Goynes*, 303 Neb. 129, 927 N.W.2d 346 (2019).

[29] Brief for appellant at 30.

testing, (2) that the person administering the test was qualified and held a valid permit, (3) that the test was properly conducted under the methods stated by the Department of Health and Human Services, and (4) that all other statutes were satisfied.[30] Reasonable proof is all that is required to meet the foundational requirements.[31]

[20] Section 60-6,201(3) provides that "[t]o be considered valid," breath tests "shall be performed according to methods approved by the Department of Health and Human Services." The rules and regulations of the Department of Health and Human Services relating to the analysis for the determination of alcohol content in blood or breath are contained in title 177, chapter 1, of the Nebraska Administrative Code. We have held with regard to the admission of breath sample test results where the records of the maintenance of a machine are relied on to prove that the machine was properly maintained, the records admitted at trial must show by satisfactory evidence that the inspections complied with all requirements of title 177.[32]

[21-25] The construction of the regulations is a matter of law in connection with which an appellate court has an obligation to reach an independent determination regardless of the ruling of the court below.[33] For purposes of construction, a rule or regulation of an administrative agency is generally treated like a statute.[34] An appellate court will not resort to interpretation to ascertain the meaning of statutory words that are plain, direct, and unambiguous.[35] A collection of statutes pertaining to a single subject matter are in pari materia and should be

---

[30] *State v. Jasa*, 297 Neb. 822, 901 N.W.2d 315 (2017).

[31] See *State v. Kudlacek, supra* note 26.

[32] *State v. Bullock*, 223 Neb. 182, 388 N.W.2d 505 (1986).

[33] See *In re Application No. OP-0003*, 303 Neb. 872, 932 N.W.2d 653 (2019).

[34] *State v. McIntyre*, 290 Neb. 1021, 863 N.W.2d 471 (2015).

[35] *Shelter Mut. Ins. Co. v. Freudenburg*, 304 Neb. 1015, 938 N.W.2d 92 (2020).

conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.[36] It is impermissible to follow a literal reading that engenders absurd consequences where there is an alternative interpretation that reasonably effects a statute's purpose.[37]

The DataMaster is an approved breath testing device[38] and, under the regulations, must be calibrated by the maintenance officer every 40 days and within 40 days prior to an analysis.[39] Section 008 encompasses the "List of Approved Methods, Breath Testing Instruments, Calibration Devices, and Internal Reference Standards." Before placement into service at a testing site, the "internal quartz standard" of the DataMaster shall have the calibration checked with an alcohol wet bath simulator solution or dry gas standard.[40] The regulations outline how testing device calibration and calibration verification shall be performed.[41] The regulations further specify that the wet bath simulator solution "must be accompanied by a certificate of analysis" and that the certificate of analysis "must contain" certain information, including the "[n]ame of the person who tested the solution."[42]

In *State v. Krannawitter*,[43] we held in the context of a motion for new trial that the discovery that the wrong name had been listed in the original calibration certificates did not mean the DataMaster test results would probably have been inadmissible. We explained that the discovery of the name error was

---

[36] *Id.*

[37] *Id.*

[38] See 177 Neb. Admin. Code, ch. 1, § 008 (2016).

[39] See 177 Neb. Admin. Code, ch. 1, §§ 009 and 010 (2016).

[40] See 177 Neb. Admin. Code, ch. 1, § 008.03A (2016).

[41] See 177 Neb. Admin. Code, ch. 1, § 008.04 (2016).

[42] See 177 Neb. Admin. Code, ch. 1, § 008.04A (2016).

[43] *State v. Krannawitter, ante* p. 66, 939 N.W.2d 335 (2020).

accompanied by amended calibration certificates containing the correct name, which we held were independent foundational evidence supporting the admission of the DataMaster test results. We noted that whether there is sufficient foundation is a question for the trial court, and the trial court had found that the foundational elements were met by the amended certificates.

The trial court likewise found here that the foundational elements for the admission of Montoya's breath test results had been met, and we find no error in its judgment. In considering whether the trial court properly overruled a renewed objection at trial to evidence on the ground of lack of foundation, we consider the evidence submitted at trial as well as the evidence submitted at the pretrial hearing on the objection.[44] Though the name listed for the person who tested the solutions was originally incorrect, the certificates of analysis listed the correct name of the person who tested them by the time of the admission of the test results at trial.

[26] In this context of a clerical error, we disagree with Montoya's suggestion that to "accompan[y]" under § 008.04A is limited to the moment the solution is shipped to the relevant law enforcement agency. Although Montoya is correct that there is no reference to "amended certificates" in title 177, it does not follow that they are impermissible. The solutions utilized in calibrating the DataMaster within 40 days prior to the test of Montoya's breath sample have at all times been accompanied by certificates of analysis containing all the categories of information required under title 177. There is nothing in title 177 suggesting that clerical errors in certificates of analysis cannot be corrected. The inflexibility Montoya proposes could have the absurd consequence that a DataMaster test could be deemed unreliable despite undisputed evidence at the time of trial that the records of maintenance of the machine complied with all regulatory requirements. We hold that amended certificates of analysis

---

[44] See *State v. Piper, supra* note 23.

to correct clerical errors provide satisfactory evidence that the inspections of an approved breath testing device complied with the requirements of title 177.

[27] We also disagree with Montoya's suggestion that the amended certificates were inadmissible to provide foundation for the DataMaster test results because they violated the Confrontation Clause. The Confrontation Clause provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."[45] Only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause."[46] "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."[47] If the statements are nontestimonial, then no further Confrontation Clause analysis is required.[48]

[28,29] In *Melendez-Diaz v. Massachusetts*,[49] the U.S. Supreme Court said that unless the regularly conducted activity of a business is the production of evidence for use at trial, business records are not testimonial. We have accordingly held that neither original simulator solution certifications[50] nor amended certifications[51] are testimonial for purposes of the Confrontation Clause. In either case, the simulator solution certifications are prepared in a routine manner without regard to any particular defendant.[52] In *Krannawitter*, we explained that there was no

---

[45] U.S. Const. amend. VI. Accord *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

[46] *Davis v. Washington, supra* note 45, 547 U.S. at 821.

[47] *Id.*

[48] *State v. Fischer*, 272 Neb. 963, 726 N.W.2d 176 (2007).

[49] *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009).

[50] See *State v. Fischer, supra* note 48.

[51] See *State v. Krannawitter, supra* note 43.

[52] See *State v. Fischer, supra* note 48.

indication either on the face of the amended certificates or in the testimony at trial that the amended certificates at issue in that case were prepared for a particular criminal proceeding.[53] That is also true here.

The amended certificates provided satisfactory evidence that the inspections of the DataMaster complied with the requirements of title 177, and their admission did not violate the Confrontation Clause. The trial court did not err in overruling Montoya's motion to suppress the DataMaster test results for lack of foundation, and the district court did not err in affirming the order of the county court.

## Sufficiency of Evidence

Montoya's challenge to the sufficiency of the evidence depends upon the success of his argument that the DataMaster test results were inadmissible. Having concluded that the DataMaster test results demonstrating .134 of a gram of alcohol per 210 liters of Montoya's breath were admissible, we find the evidence sufficient to support Montoya's conviction for driving under the influence.

## Excessive Sentence Challenge

Lastly, Montoya argues that his sentence to a jail term of 180 days was excessive. Montoya's sentence was within the statutory limits. The statutory penalty range was a mandatory minimum of 90 days' imprisonment and a $1,000 fine and a maximum of 1 year's imprisonment and a $1,000 fine.[54] It is also required that a person convicted of driving under the influence who has had two prior convictions shall, as part of the judgment of conviction, have his or her operator's license revoked for a period of 15 years.[55]

[30-32] Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the

---

[53] *State v. Krannawitter, supra* note 43.

[54] See Neb. Rev. Stat. § 28-106(1) (Reissue 2016).

[55] Neb. Rev. Stat. § 60-6,197.03(4) (Cum. Supp. 2018).

statutory limits.[56] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.[57] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[58]

[33,34] In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.[59] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[60]

[35-37] Montoya asserts that the county court improperly considered the fact that he committed acts after March 12, 2017, leading to charges of crimes related to driving under the influence, but on which he has not been tried. The sentencing phase is separate and apart from the trial phase, and the traditional rules of evidence may be relaxed following conviction so that the sentencing authority can receive all information pertinent to the imposition of sentence.[61] A sentencing court has broad discretion as to the source and type of evidence and

---

[56] *State v. Iddings*, 304 Neb. 759, 936 N.W.2d 747 (2020).

[57] *State v. Becker*, 304 Neb. 693, 936 N.W.2d 505 (2019).

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *State v. Jenkins*, 303 Neb. 676, 931 N.W.2d 851 (2019).

information which may be used in determining the kind and extent of the punishment to be imposed, and evidence may be presented as to any matter that the court deems relevant to the sentence.[62] It is permissible for a sentencing court to consider the information that a defendant has been charged with but not yet tried for allegedly illegal acts committed after the offense for which the defendant is being sentenced.[63] And the court's statements from the bench indicate it gave appropriate weight to the fact that Montoya had not actually been convicted of the charged crimes.

Montoya also argues that his sentence was excessive in light of his efforts at obtaining employment and his recent diagnosis with an "alcohol use disorder" as a result of his initiative to receive treatment. Montoya asserts, further, that the court did not adequately take into account that no one was injured during the commission of his crime, no children were in the vehicle, and he was cooperative with law enforcement after he was stopped.

[38] Causing bodily injury while driving under the influence is a separate crime with a different sentencing range;[64] the sentencing range for the crime Montoya was charged with already takes into account that no one was physically harmed. Although Montoya did not have children in the vehicle, there were two adult passengers placed at risk. And whether or not there are passengers in a vehicle, driving under the influence presents a serious threat to public safety.[65]

[39] Montoya's cooperation and his efforts toward employment and treatment were weighed by the sentencing court against the gravity of this third-time offense endangering public safety. It is not the function of an appellate court to conduct a

---

[62] *State v. Anglemyer*, 269 Neb. 237, 691 N.W.2d 153 (2005).

[63] See, *State v. Becker, supra* note 57; *State v. Williams*, 282 Neb. 182, 802 N.W.2d 421 (2011).

[64] See Neb. Rev. Stat. § 60-6,198 (Cum. Supp. 2018).

[65] See *State v. Rice*, 269 Neb. 717, 695 N.W.2d 418 (2005).

de novo review of the record to determine whether a sentence is appropriate.[66]

Like the district court, we find no abuse of discretion in the sentence imposed.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court, which found no error in the challenged rulings by the trial court.

Affirmed.

---

[66] *State v. Gibson*, 302 Neb. 833, 925 N.W.2d 678 (2019).