IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. SANCHEZ


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

ANTHONY A. SANCHEZ, APPELLANT.


Filed June 29, 2021.    No. A-20-351.


Appeal from the District Court for Douglas County: GARY B. RANDALL, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Christine A. Mori for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.


RIEDMANN, ARTERBURN, and WELCH, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Anthony A. Sanchez was convicted by a jury of second degree murder, second degree assault, and two counts of use of a deadly weapon to commit a felony. The district court for Douglas County sentenced Sanchez to consecutive terms of imprisonment totaling 40 to 65 years. On appeal, Sanchez argues that the district court erred in denying his motion in limine and motions to suppress, in overruling his motion for a mistrial, and in imposing excessive sentences. Sanchez also alleges that there was insufficient evidence to support his convictions. For the reasons set forth below, we affirm.

## BACKGROUND

On the evening of July 15, 2018, a group of individuals from Crete, Nebraska, traveled to a nightclub in Omaha, Nebraska, to go dancing. As the group from Crete walked through the parking lot toward the entrance, they encountered four men from Omaha who had exited the

- 1 -

nightclub. The two groups began to exchange words which led to a fight. After a few minutes of fighting, Edgar Gonzalez-Mendez was shot in the cheek while his brother, Franco Gonzalez-Mendez, was killed by a shot that went through his chest. Franco was also shot in the leg.

*Testimony of Omaha Group.*

Franco, Edgar, Victor Serrano, and Omar Moreno (the Omaha group) spent July 15, 2018, together swimming, eating out, and drinking alcoholic beverages. The Omaha group went to a nightclub around 10 p.m. On their way into the nightclub, they were patted down by a security guard. They stayed for a period of time, drank beer, and then left around 11:30 p.m.

According to the testimony of Edgar, as the Omaha group left the nightclub, Franco and Serrano walked ahead of Edgar and Moreno. Edgar explained that he saw approximately six men coming toward the entrance of the nightclub. Edgar remembered what two of the men looked like. He described "one [as a] chubby guy, glasses, a little dark-skinned, then one that was bald, a little light-skinned, was wearing like a white shirt." Edgar saw someone bump into Moreno and then saw Moreno exchange words with that same person. Edgar attempted to keep walking away. Initially, only Moreno and the man with glasses were exchanging words. However, more men came forward and the Omaha group "[was] getting a little rowdy because of the beer that [they] had in [them]." Edgar decided to punch the guy with the glasses. After Edgar's first punch, it turned "into a brawl." Edgar continued fighting with two or three guys. He heard Serrano yell "get the gun" and felt a gunshot to the right side of his face. He testified that at the moment he was shot, he was fighting with the chubby man wearing glasses and, as such, knew he was not the man with the gun. After he was shot, he "blacked out" for a moment and heard more gunshots from where Serrano and Franco had been fighting with the bald man. Edgar saw the other group of men running and noticed that one of them was now shirtless. He noticed this man reach toward his waistline, either tucking something in or pulling his pants up. On cross-examination, he acknowledged that his testimony at trial was the first time that he recounted seeing the shirtless man reach toward his waistline. Edgar testified that he ran to a bystander's vehicle in the parking lot to borrow a cell phone to call his wife before returning to the area where the fight occurred as police and medical personnel arrived on the scene. He was then given medical attention and taken to the hospital by paramedics. He was released from the hospital after a stay of 2 to 3 days.

Serrano testified that he remembered three of the men describing one as bald, one that had glasses, and one as "the short one." Serrano testified that the bald man was hit by one of the Omaha group, apparently startling him. He then saw the bald man reach back. He punched the bald man because he thought the man was reaching for a gun. Serrano stated that at that point he saw a gun and began to wrestle with the bald man to prevent him from getting to the gun. Serrano saw the gun fall and yelled that there was a gun on the ground. He attempted to physically restrain the bald man from grabbing the gun and yelled at Franco to get the gun. Franco instead ran up to the bald man and punched him while Serrano had him restrained. Serrano then attempted to flip the bald man onto his back, but the man slipped out of his shirt and ran toward the gun. Serrano dropped the shirt and started toward the gun, but upon realizing that the bald man would beat him there, yelled at everyone to run. Serrano ran toward the entrance of the nightclub. On cross-examination, Serrano admitted that he did not see anyone actually pick up the gun. Once he was out of the view

of the parking lot, Serrano fell to the ground and heard a couple of gunshots in rapid succession. He re-entered the parking lot after police arrived.

*Testimony of Crete Group.*

On July 15, 2018, Elvin Flores and Ingrid Flores, along with their neighbors, Gregorio Espinoza and his significant other Gloria Romero, planned to travel from Crete to Omaha to go dancing at the nightclub. Before they left, three additional men, Rene Perez, Anthony Sanchez, and Elvin's Uncle Lucio were invited to join them. They took two vehicles, with Elvin and Ingrid along with the three men taking Elvin's Dodge Ram truck and Espinoza and Romero taking their Nissan Altima. Once the Crete group arrived at the nightclub, Elvin and Ingrid walked ahead of everyone toward the entrance of the nightclub. According to Elvin, as they were walking, a group of men leaving the nightclub began to make comments toward Elvin. Then the group of men who were exiting began to exchange words with Sanchez and Perez. This prompted Elvin to stop and approach the group arguing. According to Elvin, all of the men in the Crete group became involved except for Lucio. Elvin saw Perez, who was wearing glasses, get punched. A brawl ensued. Elvin was engaged in fighting with one member of the Omaha group and did not see what anyone else was doing during the fight. He did not see anyone in either group holding a gun. However when he heard gunshots, he ran to his truck. As soon as all of the Crete group had returned to their vehicles, they returned to Crete. According to Elvin, they did not speak to each other on the way home. When they arrived back in Crete, Elvin spoke with Sanchez outside his home. Elvin saw Sanchez holding "something that looked like a gun." As they spoke, Sanchez told Elvin that he "shot at the ground." Elvin did not ask Sanchez any other questions about the gun. Sanchez told Elvin "not to say anything." Elvin reported that he perceived Sanchez' statement to be a threat.

Espinoza testified that upon the Crete group's arrival in Omaha, Elvin and Ingrid were the first to start walking toward the nightclub. He saw Elvin begin to exchange words with a group of men in the parking lot who appeared to be leaving. He then saw Perez and Sanchez become involved in the standoff. When the fight began, Espinoza saw two people holding Sanchez, punching him and attempting to remove his shirt. Espinoza then entered the fight and engaged with one of the persons who was fighting Sanchez and Perez. After a short period of fighting, Espinoza heard three gunshots that sounded like fireworks. Once the shots were fired, the fighting stopped. Espinoza then saw Sanchez, shirtless, shooting up in the air. Sanchez then put the gun in his pants pocket and everyone in the Crete group ran back to their vehicles and left. On the way home, he realized that he had lost his cell phone.

Ingrid testified that on the way into the nightclub, there was an altercation. However, she did not watch the fistfight. She testified that her first indication that it was more than an argument was when she heard the gunshots. After hearing the shots, she ran back to the Dodge Ram pickup. On the way home, she sat next to Sanchez. She noted that Sanchez was not wearing a shirt, but she did not see a gun. A few minutes after arriving back home, Ingrid drove Perez and Sanchez home.

Romero testified that she and Espinoza were the last to start in toward the nightclub. She saw the fight ahead that involved several men from the Crete group and persons unknown to her. When Espinoza entered the fight, she walked closer to the nightclub, eventually joining Ingrid. After hearing the shots fired, she ran back to the car where Espinoza joined her. They then followed the Dodge Ram out of the parking lot and returned to Crete.

*Bystander Testimony.*

At trial, the State called Edith Garcia, who was parked on the street near the nightclub talking to her boyfriend on the phone when she heard gunshots. She then saw people running. A man who was injured and bleeding from what she believed to be his neck came up to her vehicle and asked to use her cell phone. She reported that she saw a black truck and a small white vehicle that she believed to be a Honda Civic leave in a hurry after the shots were fired. She also noted that the injured man was bald with a beard and had a torn shirt from the back, as if he had been fighting.

Sanchez called two bystander witnesses to testify, Lizbeth Cortez and Maria Tapia. Cortez was in her vehicle at the nightclub when she heard gunshots. She saw a substance in the air that she believed to be smoke or gunpowder and an individual wearing a black shirt. Tapia testified that she heard gunshots and then saw a man holding the right side of his face running to a red Tahoe parked on the street, open the driver's side door, and shut the door before going back to where the rest of the people were. All the individuals who were at the scene and testified at trial, whether part of the Crete group, the Omaha group, or otherwise, testified that the gunshots they heard came in a rapid sequence and all sounded alike.

*Investigation.*

An off duty Omaha Police officer was working security at the entrance of the nightclub at the time of the shooting. The entrance was around the corner of the building from the parking lot, so he had no view of the incident. Prior to hearing the shots, he was told by a woman running toward the entrance that a fight was occurring in the parking lot. He then heard the shots and called in a report using his police issued radio. Police cruisers and emergency personnel began to arrive within a few minutes. A paramedic attempted to administer CPR to Franco, but Franco was unresponsive. Edgar was treated by the paramedics and emergency personnel for a gunshot wound to his right cheek. He was ultimately taken to the hospital to be treated for his gunshot wound.

The autopsy of Franco revealed that he died of a through-and-through gunshot wound to his torso. According to Dr. Michelle Elieff, the forensic pathologist who conducted the autopsy, the bullet entered Franco's left back shoulder, traveling left to right, back to front, and on a slightly downward angle through his left lung, descending aorta, and his right lung before exiting under his right armpit. He also sustained a through-and-through gunshot wound to the left thigh which, in contrast, traveled right to left and slightly upward. According to Elieff, Franco was shot from an indeterminate range. She explained that she found no soot or stippling on Franco's body. She explained that the presence of soot on the body would have indicated that the gunshot was from very close range. The presence of stippling, otherwise known as powder tattooing, would indicate that the gunshot was from an intermediate range. Given the absence of both, she opined that the shot was fired from an indeterminate range, "not too close, but not too far away." On cross-examination, she conceded that some stippling may not be seen due to clothing worn by the decedent. She also opined that due to the nature of the entry wound, she did not believe the fatal shot had ricocheted off another surface before hitting Franco.

After Edgar and Franco were transported to the hospital, police remained on the scene to investigate and place items into evidence. They found eight 9mm shell casings, a cell phone, a gray t-shirt that was bloody and ripped, and apparent blood on the ground. There was a Cadillac

Escalade in the parking lot with a flat tire, which was impounded and a bullet was later extracted from the tire.

A review of surveillance video revealed that the two vehicles seen leaving the parking lot following the fight were a Dodge Ram pickup and a Nissan. Following a search of the cell phone, Omaha Police investigators determined that the cell phone at the scene of the shooting belonged to Espinoza and determined that he lived in Crete. Omaha Police detectives went to Crete and located Espinoza at his residence. They also located a black or dark grey Dodge Ram pickup in his garage with a tan or gold Nissan Altima just outside. They determined that the pickup was registered to Elvin and the Nissan was registered to Espinoza. Espinoza and Elvin were transported to the Saline County Sheriff's office for questioning.

Neither Espinoza nor Elvin were initially forthcoming with police regarding the details of what had occurred at the nightclub. Initially, Lucio was not disclosed as being involved in going to the nightclub because Elvin did not know Lucio's immigration status. Elvin did not disclose Lucio's last name or where he lived because, he testified, that despite being his uncle, he did not know this information. However, over the course of the following months police continued to interview Espinoza, Elvin, Romero, and Ingrid and received further details about the night of the shooting including the information they ultimately testified to regarding Sanchez' involvement with a gun. Elvin reported that he felt increased pressure from Omaha Police during this investigation because he thought they would go to jail.

As police obtained further details about the shooting, Perez and Sanchez became the primary suspects of the investigation and an arrest warrant was obtained for Sanchez. Police were unable to locate Sanchez and obtained an order pursuant to 18 U.S.C. § 2703(d) authorizing them to use a tracking device on his Facebook account. The Facebook tracking device led them to a house in Crete. Ultimately, they were unable to locate Sanchez at this location. However, they did interview a Crete resident who believed that Sanchez may be found at a residence on Hawthorne Avenue in Crete. This address matched an address given by Perez as his residence when he was arrested on January 5, 2019. On January 7, Omaha Police officers working in concert with Crete Police received a search warrant for the Hawthorne Avenue residence. Sanchez was found therein and arrested.

During the search of the Hawthorne residence, police found several items that were collected and placed into evidence. In the basement of the residence, Omaha Police found a wallet with Perez' identification, a hat and a plaid shirt that appeared to match the clothing Perez was wearing in surveillance footage obtained from the night of the shooting, a magazine for a 9mm firearm, two boxes of 9mm ammunition, and loose rounds of 9mm ammunition. Although Sanchez was found in the residence, no venue items were found indicating that Sanchez was living there.

Ballistics testing was conducted on the eight 9mm casings found in the parking lot. Angela Harder, a firearm and tool mark examiner employed by the Omaha Police Department, testified that all eight casings had been fired by the same gun. The 9mm ammunition found at the Hawthorne residence was also examined by Harder. She determined that the ammunition shared the same manufacturer, caliber, and general construction as the casings that were found in the nightclub's parking lot.

The gray t-shirt was taken to the University of Nebraska Medical Center for DNA analysis. Melissa Helligso, a forensic DNA analyst, conducted the testing. She was able to obtain a partial

profile from a swab taken from the neck area and a full profile from a blood stain on the front of the shirt. The results of the partial profile coincided with the full profile. The full profile was then compared initially to known DNA samples obtained from Franco, Edgar, and Serrano, all members of the Omaha group. They were each excluded as being a contributor to the DNA found on the shirt. Following Sanchez' eventual arrest, a known sample from Sanchez was compared to the full profile taken from the shirt. The result of the comparison showed a match at all 24 loci, thus Sanchez could not be excluded as the source of the blood. Helligso testified that the odds of the blood on the shirt belonging to someone not related to Sanchez was 1 in 6.676 nonillion. She explained that 1 nonillion is 1 followed by 30 zeros.

*Pretrial Motions.*

Prior to trial, Sanchez filed a series of motions to preclude the State from presenting certain evidence that was seized as a result of the various searches. He filed an amended motion to suppress and motion in limine on October 10, 2019. In this amended motion to suppress he sought to exclude the State from using any and all evidence gained by the State as a result of his arrest and search of his person, as well as the search of the Hawthorne residence. He alleged that the arrest warrant did not have sufficient probable cause that he had committed a crime or was committing a crime. He also alleged that the search of the Hawthorne residence was conducted without his consent or a valid search warrant. Moreover, he alleged that the affidavit for search warrant did not contain sufficient information to establish probable cause to believe a crime or evidence of a crime would be found at the Hawthorne residence.

He alleged in his motion in limine that the evidence gained as a result of the search and arrest of Sanchez conducted by police on January 7, 2019, at the Hawthorne residence was not relevant or admissible under Neb. Rev. Stat. §§ 27-401, 27-402, and 27-404 (Reissue 2016). He further alleged that any probative value that the evidence may have was outweighed by unfair prejudice, therefore, making it inadmissible under Neb. Rev. Stat. § 27-403 (Reissue 2016).

Sanchez also filed a motion to suppress on November 1, 2019. In this motion to suppress, he sought to suppress and exclude from use against him any and all evidence gained by the State as a result of the forensic search and installation of a pen-register and trap/trace device for the Facebook account "Armando Sanchez." Sanchez alleged that the affidavit in support of the court order failed to provide factual information upon which the magistrate could determine the existence of probable cause. Sanchez alleged that the court order included approval to obtain records which would supply information that revealed Sanchez' location in Crete and that without this information, the State could not present this evidence. Moreover, he alleged that there were not reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing investigation as required under 18 U.S.C. § 2703(d). He specifically prayed that the court suppress and exclude from use against him at trial any and all evidence obtained as a result of the search of his Facebook account because the order was issued in violation of his constitutional rights.

On January 7, 2020, the district court denied Sanchez' amended motion to suppress, motion in limine, and second motion to suppress. With respect to the amended motion to suppress, the district court determined that the affidavit in support of the arrest warrant was sufficient to establish probable cause. With respect to the motion to suppress which sought to exclude evidence obtained

through the court order of the Facebook account, the district court determined that Sanchez had no reasonable expectation of privacy in the subscriber IP address information obtained from Facebook and the ISP. The district court also determined that this information is not exempt from the third party doctrine. The district court concluded that the affidavit met the "reasonable grounds to believe" that the records or other information sought were relevant and material to an ongoing investigation as required under 18 U.S.C. § 2703(d). The district court then determined that Sanchez did not have standing to contest the search warrant for the Hawthorne residence because there was not sufficient evidence showing that Sanchez had more than temporary, limited access to the residence. The court further noted that there was no evidence that Sanchez had a key to the residence, maintained any belongings in the residence, or had an unrestricted right of access.

The district court denied Sanchez' motion in limine with respect to the items seized from the Hawthorne residence. The district court determined that these items being present in the Hawthorne residence does not implicate Sanchez' disposition, morals, or lack of morals and thus were not inadmissible character evidence under § 27-404. The district court determined that the hat, shirt, and wallet were relevant under § 27-401 and may be admissible at trial under § 27-402 but declined to determine at that time that the items' probative value was substantially outweighed by its prejudicial effort.

*Verdict and Sentences.*

The State ultimately filed an information charging Sanchez with one count of murder in the first degree in violation of Neb. Rev. Stat. § 28-303(1) (Reissue 2016), a Class IA Felony; two counts of use of a firearm to commit a felony, each in violation of Neb. Rev. Stat. § 28-1205(1)(a) (Reissue 2016), and each a Class IC felony; and assault in the second degree, in violation of Neb. Rev. Stat. § 28-309(1) (Reissue 2016), a Class IIA felony. Following trial, the jury found Sanchez guilty of murder in the second degree, second degree assault, and two counts of use of a deadly weapon to commit a felony. The district court accepted the jury's verdict. At sentencing, Sanchez' counsel noted that Sanchez did not wish to make a statement. The State argued that Sanchez had a history of violence prior to these offenses and had continued with such violent behavior since being incarcerated. The district court sentenced Sanchez on his conviction for murder in the second degree to 20 to 30 years' imprisonment; on his first conviction for use of a deadly weapon to commit a felony to 5 to 10 years' imprisonment; on his conviction for assault in the second degree to 10 to 15 years' imprisonment, and on his second conviction for use of a deadly weapon to commit a felony to 5 to 10 years' imprisonment. The district court ordered these four sentences to be served consecutively, for a total of 40 to 65 years' imprisonment with a credit for 465 days served.

Further factual details will be set forth below, as relevant to Sanchez' specific assignments of error. Sanchez appeals to this court.

ASSIGNMENTS OF ERROR

Sanchez assigns that the district court erred when it (1) overruled Sanchez' motion in limine with respect to the items seized at the Hawthorne residence, (2) denied Sanchez' motion to suppress evidence obtained through the search of his electronic communications, (3) denied Sanchez' motion to suppress evidence obtained as a result of the search of the Hawthorne

residence, (4) denied his motion for mistrial made after Elvin invoked his Fifth Amendment privilege during his testimony, and (5) imposed an excessive sentence. In addition, Sanchez assigns that there was not sufficient evidence for the jury to find him guilty beyond a reasonable doubt of the crimes he was charged with.

## STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020). A trial court's determination of the relevancy and admissibility of evidence must be upheld in the absence of an abuse of discretion. *Id.* Balancing the probative value of evidence against the danger of unfair prejudice is within the discretion of the trial court. *Id.* In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination. *State v. Montoya*, 305 Neb. 581, 941 N.W.2d 474 (2020).

The decision whether to grant a motion for mistrial is within the trial court's discretion and will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Smith*, 302 Neb. 154, 922 N.W.2d 444 (2019). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Iddings*, 304 Neb. 759, 936 N.W.2d 747 (2020).

## ANALYSIS

*Motion in Limine.*

On appeal, Sanchez argues that the district court erred when it denied his motion in limine and permitted the items found during the search of the Hawthorne residence to be received into evidence. Sanchez argues that the probative value was substantially outweighed by the danger of unfair prejudice. The State argues that Sanchez waived this argument on appeal by failing to properly object. We agree with the State's position.

A motion in limine is a procedural step to prevent prejudicial evidence from reaching the jury. *State v. Savage*, 301 Neb. 873, 920 N.W.2d 692 (2018). The purpose of a motion in limine is to produce, when appropriate, an advance ruling on anticipated objectionable material, and the denial of the motion cannot, in and of itself, constitute reversible error. *Id.* Because overruling a motion in limine is not a final ruling on admissibility of evidence and therefore does not present a question for appellate review, a question concerning admissibility of evidence which is the subject

of a motion in limine is raised and preserved for appellate review by an appropriate objection to the evidence during trial. *State v. Glazebrook*, 22 Neb. App. 621, 859 N.W.2d 341 (2015). Failure to make a timely objection waives the right to assert prejudicial error on appeal. *Id.*

A standing objection under Neb. Rev. Stat. § 25-1141 (Reissue 2016) preserves an error for appellate review and makes it unnecessary to repeat the same objection to further testimony of the same nature by the same witness. However, as the Nebraska Supreme Court has previously explained, a continuing objection does not preserve the objection on appeal when applied to testimony given by a different witness when no objection is made to that witness' testimony. See *State v. Pope*, 305 Neb. 912, 943 N.W.2d 294 (2020). In *State v. Castillas*, 285 Neb. 174, 826 N.W.2d 255 (2013), *disapproved on other grounds, State v. Lantz*, 290 Neb. 757, 861 N.W.2d 728 (2015), Castillas filed a motion in limine to exclude evidence that a witness saw him hold a rifle that he was alleged to have used in multiple shootings. The court overruled the motion. *Id.* During trial, Castillas was granted a continuing objection during the direct examination of three witnesses with respect to the admission of evidence of him holding a rifle. *Id.* However, he did not object or renew his objection during the testimony of the fourth and final witness. That witness testified without objection to seeing Castillas in possession of a .22 rifle that looked like the weapon he allegedly used to commit the charged crimes. *Id.* The Supreme Court determined that the continuing objection did not apply to the last witness when no objection was made to that witness' testimony. *Id.* Therefore, Castillas waived his objection to the evidence by failing to object. *Id.*

With this review in mind, we turn to the facts of the present case. Sanchez filed a motion in limine with respect to the items found at the Hawthorne residence arguing that the items were not relevant or admissible under §§ 27-401, 27-402, and 27-404, and that the items would be unfairly prejudicial under § 27-403. The court overruled his motion in limine. During trial, Sanchez specifically renewed the motion in limine with respect to the testimony of Omaha Police Detective Sherry King. During King's direct examination, the following exchange occurred:

> [Sanchez]: Judge, I believe that we're getting into the arrest and search of the location where Mr. Sanchez was taken into custody which relates back to our motion in limine that we previously filed and was overruled by the Court. I'm renewing my motion and would ask that the Court grant me a standing objection to all remaining inquiries to this line of questioning so I don't have to keep interrupting [the State].
>
> The Court: Granted.

King continued her testimony as to what was found at the Hawthorne residence. Specifically, she testified that she found a black hat, a plaid shirt, and a gun magazine for a 9mm handgun. She also testified that there was other 9mm ammunition found at the Hawthorne residence. Photographs of these items were received into evidence.

Sanchez failed to object to the testimony of or renew his motion in limine with respect to the testimony of Kim Van Den Akker and Harder who testified about the same evidence. Van Den Akker, a forensic technician employed with the Omaha Police Department, testified as to the actual seizure of the same evidence found at the Hawthorne residence. During her testimony, the State referred to the same photographs that were previously received when King testified. Van Den Akker specifically testified as to photographing and collecting the hat, shirt, and ammunition that was found at the Hawthorne residence. Harder, Omaha Police's senior firearm

and tool mark examiner, testified regarding the ammunition that was found at the Hawthorne residence. She determined that they were the same manufacturer, same caliber, and the same general construction as the casings found in the nightclub parking lot. No objection was made to her testimony.

Sanchez was granted a standing objection during King's testimony, however this objection cannot be applied to the subsequent witnesses. As such, Sanchez would have needed to object when Van Den Akker and Harder testified as to the same evidence. He failed to do so. Because he did not renew his motion in limine or object during the testimony of either Van Den Akker or Harder, Sanchez has not preserved this argument for appellate review.

*Motions to Suppress.*

Sanchez argues that the court erred in denying his motions to suppress evidence. He first argues that the information gained from the court order regarding his Facebook account included Sanchez' location and prompted the fugitive unit to converge on Crete in search of Sanchez. He further argues that any of the evidence obtained in the Hawthorne residence including a 9mm magazine, 9mm ammunition, and the personal effects of Perez should have been excluded as fruit of the poisonous tree. Sanchez also argues that the district court erred in denying his "motion to suppress evidence obtained as the result of his unconstitutional arrest and search of the Hawthorne residence." Brief for appellant at 23. He further argues that there was insufficient probable cause to issue the arrest warrant for his person and the search warrant for the Hawthorne residence. As such, he argues that any of the evidence found as a result of his arrest and the search warrant constituted fruit of the poisonous tree. However, we do not find that Sanchez properly preserved these errors for appellate review.

Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. *State v. Montoya*, 305 Neb. 581, 941 N.W.2d 474 (2020). Evidence obtained as the fruit of an illegal search or seizure is inadmissible in a state prosecution and must be excluded. *Id.* When a motion to suppress is overruled, the defendant must make a specific objection at trial to the offer of the evidence which was the subject of the motion to suppress in order to preserve the issue for review on appeal. *State v. Smith*, 269 Neb. 773, 696 N.W.2d 871 (2005). A failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and a party will not be heard to complain of the alleged error on appeal. *State v. Montoya, supra*. An objection based on a specific ground and properly overruled, does not preserve a question for appellate review on some other ground not specified at trial. *State v. Lowman*, 308 Neb. 482, 954 N.W.2d 905 (2021).

In *State v. Lowman, supra*, the Supreme Court determined that Lowman failed to preserve the suppression issue with regard to the evidence found during the search of his person. Lowman objected and renewed his motion to suppress when the State offered exhibits into evidence but did not object or specifically renew the motion to suppress when the State offered into evidence the digital scale, the torch-style lighter, bags containing a white crystalline substance, and the weight contained in the black bag found on him. *Id.* Lowman's counsel objected based on matters such as foundation, authentication, and chain of custody. *Id.* In addition, Lowman failed to renew his

objection based on the motion to suppress when a forensic chemist testified that the bags contained methamphetamine. *Id.*

In the present case, Sanchez made no objections at all based on his motions to suppress. He did renew his motion in limine with respect to King's testimony regarding the search of the Hawthorne residence. Even if we were to consider the renewal of the motion in limine to also be a renewal of the motion to suppress, which we decline to do, Sanchez did not renew this objection during the testimony of either Van Den Akker or Harder. Accordingly, we find that he failed to properly preserve his suppression motions for appellate review.

*Witness Invocation of Fifth Amendment Privilege During Trial.*

Sanchez next claims that the district court erred by failing to grant his motion for mistrial following Elvin invoking his Fifth Amendment privilege during his testimony. Sanchez also alleges that the district court did not complete a proper inquiry into the nature of the testimony and failed to issue a curative instruction to ensure the jury did not afford any weight to the witness' invocation of the privilege. We address these issues in turn. First, we recite the relevant facts as necessary to analyze this error.

During his testimony, Elvin testified that when they arrived back in Crete, he saw Sanchez holding something that looked like a gun. After explaining that Sanchez told him that he only shot at the ground, the following exchange occurred:

[The State]: When he said that, did you ask him any questions about it?
[Elvin]: No.
[The State]: Had you seen a gun before seeing that gun that night?
[Elvin]: No.
[The State]: Did he say anything to you after that?
[Elvin]: I plead the Fifth.

Immediately following this exchange, the jury was excused for the noon recess. Once the jury had exited the courtroom, one of the prosecutors told the court that they would speak with Elvin and determine whether independent counsel should be provided to him. After the recess, further hearing was held outside the presence of the jury. Sanchez immediately moved for a mistrial. In response, the district court stated that "since [Elvin] is not a criminal defendant in this case, nor are we talking about criminal activity, I don't believe that he has a right to the Fifth Amendment at this point," and then inquired of counsel for the State. One of the prosecutors stated that they had the opportunity to converse with Elvin over the lunch hour and had answered all of his questions. According to the prosecutor, Elvin was "under a mistaken belief of what he was actually saying" and was now willing to answer the question.

While still outside the presence of the jury, Sanchez conducted a voir dire examination of Elvin. During this examination, Elvin stated that during his conversation with the prosecutors he did not ask for his own attorney and was not promised anything with regard to the State potentially prosecuting him. He also stated that he had not previously indicated to the State that he wished to remain silent during questioning. The court overruled the motion for mistrial prior to the voir dire examination, but still allowed Sanchez to question the witness. Upon the close of the voir dire

examination the court stated that "we'll get the jury" and proceeded with trial. No curative instruction was given.

Once the jury was reseated in the courtroom the direct examination of Elvin by the State resumed. Elvin explained that he did not know what prompted him to not want to answer the State's questions. Then, in response to the State's questions, he testified that Sanchez told him that he had shot at the ground and that Sanchez told him not to say anything.

The Nebraska Evidence Rules, contained in chapter 27 of the Nebraska revised statutes, as well as our case law interpreting those rules, direct trial courts to avoid a jury's exposure to a witness' claim of privilege whenever possible. See *State v. Draper*, 289 Neb. 777, 857 N.W.2d 334 (2015). Neb. Rev. Stat. § 27-513(2) (Reissue 2016) provides that "proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury." The purpose of this statute is to prevent the jury from drawing an unfavorable inference from a witness' assertion of a privilege. *State v. Munoz*, 303 Neb. 69, 927 N.W.2d 25 (2019). Absent extraordinary circumstances, trial courts should exercise their discretion to forbid parties from calling witnesses who, when called, will only invoke a privilege. *State v. Draper, supra*.

In *Draper*, the Supreme Court explained that a hearing is not absolutely required to comply with § 27-513(2). Nevertheless, the Supreme Court determined that the trial court failed to comply with the requirements of § 27-513(2) because all parties knew, prior to her testimony, that the witness would invoke her privilege against self-incrimination. The record therein failed to establish any justification for requiring the witness to make her invocation in the presence of the jury. The court found that the purpose of § 27-513(2) applied, notwithstanding the State's plan to offer her immunity.

In the present case, Elvin had not given the State or the defense any indication that he would invoke his Fifth Amendment privilege prior to trial. While outside of the presence of the jury, the State informed the court that Elvin would now answer the question. Elvin was then examined outside the presence of the jury by Sanchez. During that examination, Elvin gave no indication that he would continue to assert his privilege. When the jury returned, Elvin answered the questions posed by the State and was cross-examined by Sanchez on the same issues. Accordingly, under the facts of this case, we cannot find that the court erred by failing to conduct a further inquiry to determine whether Elvin would continue to refuse to testify.

We further find that the district court properly overruled Sanchez' motion for a mistrial. A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Lester*, 295 Neb. 878, 898 N.W.2d 299 (2017). The U.S. Supreme Court has described two circumstances when the prosecutor's calling of a witness to the stand with the knowledge that the witness would invoke the privilege against self-incrimination constituted reversible error. *Namet v. United States*, 373 U.S. 179, 83 S. Ct. 1151, 10 L. Ed. 2d 278 (1963). The first circumstance is based upon a concept of prosecutorial misconduct, when the prosecution makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. *Id.* The second circumstance is when the inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination. *Id.* In determining whether critical weight was added, the

Nebraska Supreme Court has listed the following factors to consider: whether the State knew the witness would invoke the privilege, the number of questions that elicit an assertion of the privilege, whether the inferences are merely cumulative of other evidence, whether the inferences relate to central or collateral matters, whether either side attempted to draw adverse inferences in closing argument or at any other time during trial, and whether the jury was instructed not to draw an inference from the witness' refusal to testify. *State v. Draper*, 289 Neb. 777, 857 N.W.2d 334 (2015).

In the present case, the State was not aware that Elvin would invoke his Fifth Amendment privilege; therefore, the first circumstance under *Namet* does not apply. We must then analyze whether reversible error occurred under the critical weight analysis. Elvin asserted privilege on one question, then following the break retracted his assertion. He proceeded to answer the same question originally posed while in the presence of the jury. While arguably an initial inference could have been made that he was protecting himself, his immediate retraction and answer to the question while in the presence of the jury effectively dispelled that inference. Based on the facts and circumstances of this case, we cannot say that the district court abused its discretion in overruling the motion for mistrial.

To the extent that Sanchez argues that there was no limiting instruction given to the jury, we note that Sanchez made no request for such an instruction at trial. Section 27-513(3) provides "[u]pon request, any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom." In the absence of a request for a limiting instruction, there is no reversible error in a court's failure to give a limiting instruction. *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013). Thus, while the court could have given a curative instruction even absent a request by Sanchez, Sanchez cannot now complain about the lack of such an instruction given his failure to make the request. The court committed no error by failing to give a limiting instruction. Accordingly, we find Sanchez' assignment of error with respect to Elvin's invocation of his Fifth Amendment privilege to be without merit.

*Sufficiency of Evidence.*

In his brief on appeal, Sanchez argues that the evidence adduced at trial was not sufficient to find Sanchez guilty for the charges of murder in the second degree, assault in the second degree, and use of a deadly weapon to commit a felony. In sum, he argues "[t]here was insufficient evidence presented to find that [Sanchez] was the shooter." Brief for appellant at 34. He further argues that even if there was sufficient evidence to establish that Sanchez was the shooter, there was insufficient evidence to establish that he had the prerequisite intent to be found guilty of murder in the second degree. We address these issues in turn.

It is the jury's province to determine credibility, resolve conflicts, and weigh the evidence; we, as an appellate court, consider only whether there was sufficient evidence to support the finding of the jury as fact finder. *State v. Wheeler*, 308 Neb. 708, 956 N.W.2d 708 (2021). To the extent that there is conflicting testimony or that some evidence is weaker or stronger, it is the jury's duty to resolve inconsistencies, to weigh the evidence, and to determine which witnesses they found to be credible. *Id.*

When viewing the totality of the evidence in the light most favorable to the State, we find that there was sufficient evidence to support the verdict rendered by the jury as to all charges. Sanchez first argues that there was no direct or physical evidence to support the finding that Sanchez was the shooter. He argues that none of the witnesses specifically identified Sanchez as the shooter. He also notes that another witness observed what she believed to be gunpowder in the air and an individual wearing a black shirt near the gunpowder.

First, there is no evidence that more than one gun was fired in the course of the fight. The evidence established that the Omaha group was frisked prior to being allowed entry into the nightclub. Every witness who testified to hearing gunshots reported that all of the shots sounded the same. The expert testimony of Harder established that all eight cartridges found in the parking lot were fired from the same firearm. Further, the evidence nearly uniformly showed that a shirtless man was the one who fired the gun and that Sanchez was shirtless at the time the gun was fired. Serrano testified that the man he was fighting with slipped out of his shirt and ran toward the gun. While Serrano did not see who picked up the gun, Espinoza did see Sanchez shoot the gun in the air and then place it in his pocket. Edgar testified that he saw the shirtless man either pull up his shorts or place something in his waistband after the shots were fired. Members of the Crete group noticed that Sanchez was shirtless after the fight in the parking lot. The DNA testing of the blood found on the gray T-shirt excluded the Omaha group but did not exclude Sanchez. The statistical calculation demonstrated that the chances that the blood on the shirt did not belong to someone related to Sanchez was 1 in 6.86 nonillion. After arriving back in Crete, Elvin testified that he saw what he believed to be a gun in Sanchez' hand. Sanchez told Elvin that he only shot at the ground and told Elvin not to say anything, a request which Elvin perceived as a threat. Based on this evidence, the jury could have rationally inferred that Sanchez was the shooter.

To the extent that such evidence was not stronger or that there was conflicting testimony, it was the jury's duty to resolve inconsistencies, to weigh the evidence, and to determine which witnesses they found to be credible. See *State v. Wheeler, supra.* There is little question that there was a firearm, which is a deadly weapon; that Franco died as the result of a gunshot wound; or that Edgar was shot with the same firearm that shot and killed Franco. Therefore, we find that there was sufficient evidence to find that Sanchez was guilty of second degree assault and use of a deadly weapon to commit a felony.

Sanchez next argues that there was not sufficient evidence to show that he had the intent necessary to meet the elements of second degree murder. Under Neb. Rev. Stat. § 28-304 (Reissue 2016), "[a] person commits murder in the second degree if he causes the death of a person intentionally, but without premeditation." The State is not required to prove malice or premeditation, but only that the defendant's act was committed intentionally. *State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998). The intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. *State v. Lewis*, 280 Neb. 246, 785 N.W.2d 834 (2010). Intent to kill may be inferred from deliberate use of a deadly weapon in a manner reasonably likely to cause death. *State v. Escamilla*, 291 Neb. 181, 864 N.W.2d 376 (2015). From circumstances around a defendant's voluntary and willful act, a finder of fact may infer that the defendant intended a reasonably probable result of his or her act. *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003). Only where evidence lacks sufficient probative value as a matter of law may an appellate court set

aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Senn*, 295 Neb. 315, 888 N.W.2d 716 (2016).

Sanchez argues that the testimony "established a chaotic atmosphere wherein the shooter did not deliberately 'aim' at individuals, but was simply acting rashly upon the instigation of a physical brawl." Brief for appellant at 37. There is no question that there was a fight that involved both the Omaha group and the Crete group. Serrano testified that as soon as the bald man was punched, he immediately reached back as if looking for a gun. When the gun fell, Serrano attempted to restrain the bald man but failed to do so. Serrano attempted to race to get to the gun but realized he would not get there in time. After the gun fell and was picked up, there were several gunshots in rapid succession. Espinoza looked and saw Sanchez firing the gun in the air. The gunshots came from where Serrano and Franco were fighting with the bald man and where Franco had punched the bald man while Serrano was holding him. After arriving back to Crete, Sanchez told Elvin he only shot at the ground but still told Elvin not to say anything. We further note that the forensic evidence demonstrates that three shots struck human bodies. Edgar was struck in the cheek, very near multiple locations that could have resulted in his death. Franco was shot twice from an indeterminate distance, with the through and through wound to his left thigh having a right to left trajectory while the fatal wound passed through both lungs and his aorta and traveled from left to right, back to front and downward. Given the totality of the evidence, the jury could have inferred that Sanchez' firing of the gun repeatedly toward persons that he had been fighting with, and, in Franco's case, a person who had punched him while he was held by someone else, demonstrated his intention to kill the people involved in the fight. Because the jury found Sanchez guilty of second degree murder, it is apparent that the jury carefully considered the issue of intent. Sanchez was charged with first degree murder, but the jury clearly found insufficient evidence of premeditated malice. However, the jury did believe there to be sufficient evidence that Sanchez formed the requisite intent to meet the elements of second degree murder.

The law imposes a heavy burden on a defendant who claims on appeal that the evidence is insufficient to support a conviction. *State v. Escamilla, supra*. Faced with the trial record to which we have referred above, we determine that Sanchez has not carried that burden. Given the evidence, we determine that a rational trier of fact could reasonably infer that Sanchez formed an intent to deliberately kill Franco and therefore could have found beyond a reasonable doubt that Sanchez killed Franco intentionally. The evidence is therefore sufficient to support entry of the jury's verdict of second degree murder and the charge of use of firearm to commit that offense. Because the evidence was sufficient to support all of Sanchez' convictions, this assignment of error fails.

*Excessive Sentences.*

Sanchez argues that the district court erred in imposing excessive sentences because it did not place sufficient weight on his age, education and experience, and social and cultural background when it imposed its sentences. We disagree.

Second degree murder is a Class IB felony which has a minimum sentence of 20 years' imprisonment and a maximum sentence of life imprisonment. § 28-304(2); Neb. Rev. Stat. § 28-105 (Reissue 2016). Sanchez was sentenced to 20 to 30 years' imprisonment for this offense. Assault in the second degree is a Class IIA felony with a minimum punishment of 0 years'

imprisonment and a maximum sentence of 20 years' imprisonment. § 28-309(2); § 28-105. Sanchez was sentenced to 10 to 15 years' imprisonment for this offense. Use of a firearm to commit a felony is a Class IC felony which has a mandatory minimum of 5 years' imprisonment and a maximum of 50 years' imprisonment and must be imposed consecutively to any other sentence imposed. § 28-1205(1)(c) and (2); § 28-105. Sanchez was sentenced to 5 to 10 years' imprisonment for each of these offenses. Therefore, all of the sentences imposed were within the statutory sentencing limits. Accordingly, we review only for an abuse of discretion.

So long as the trial court's sentence is within the statutorily prescribed limits, is supported by competent evidence, and is not based on irrelevant considerations, an appellate court cannot say that a trial court has abused its discretion. *State v. Rivera*, 14 Neb. App. 590, 711 N.W.2d 573 (2006). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019).

In the present case, the district court did not base its decision for sentencing on any irrelevant considerations, nor does Sanchez allege that the district court did so. Instead, Sanchez argues that the district court failed to properly weigh factors in his favor. Our analysis begins with the nature of the offense. Sanchez brought a gun to a fistfight and quickly chose to use it. His actions caused the death of Franco and severely injured Edgar. The presentence investigation report (PSR) demonstrated that violent behavior has been common for Sanchez. Sanchez, who was 20 years old at the time of this offense, had an extensive history in the California juvenile court including charges of assault with a deadly weapon, burglary, and manufacture, sale, and possession of metal knuckles. He also had a prior adult conviction for trespassing. The PSR further notes that while confined at the Douglas County Correctional Center, he has incurred six disciplinary lockdown penalties--one for assaulting another inmate, three for fighting, and two for failure to comply. According to the PSR, he has denied that he has a problem with alcohol or drugs but does report that he smokes marijuana every other week. The PSR indicated that he shows a lack of motivation to live a crime-free lifestyle. He scored a 33 on the Level of Service/Case Management Inventory, a risk/need assessment tool, placing him in the very high risk category to reoffend. We further note that the sentences imposed by the district court for each of the offenses was on the lower end of the range that is allowed by law. Thus, there is competent evidence to support the sentences. Given the totality of the circumstances, including the violence committed in the offenses for which he was convicted, we cannot say the court abused its discretion in sentencing Sanchez to a total combined term of 40 to 65 years' imprisonment.

CONCLUSION

For the reasons set forth above, we affirm Sanchez' convictions and related sentences.

AFFIRMED.