Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/13/2026 08:05 AM CST

State of Nebraska, appellee, v.
Patrick L. Wright, appellant.
___ N.W.3d ___

Filed January 13, 2026.    No. A-25-031.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

2. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection.

3. **Constitutional Law: Witnesses: Appeal and Error.** An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error.

4. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

5. **Sentences.** It is within the discretion of the trial court to impose consecutive rather than concurrent sentences for separate crimes.

6. **Rules of Evidence: Hearsay.** For a statement to qualify as an excited utterance, the following criteria must be met: (1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant while under the stress of the event.

7. **Rules of Evidence: Hearsay: Time.** The key requirement for an excited utterance is spontaneity, which requires a showing the statements were made without time for conscious reflection.

8. **Constitutional Law.** The analysis of the right to confrontation under Neb. Const. art. I, § 11, is the same as that under the Sixth Amendment to the U.S. Constitution.

9. **Constitutional Law: Trial: Rules of Evidence: Hearsay.** Where "testimonial" statements are at issue, the Confrontation Clause demands that such hearsay statements be admitted at trial only if the declarant is unavailable and there had been a prior opportunity for cross-examination.

10. **Constitutional Law: Evidence: Intent.** Whether a statement is testimonial for Confrontation Clause purposes depends on the purpose or expectation of the declarant in making the statement, and the circumstances surrounding the making of the statement illuminate the purpose or expectation of the declarant.

11. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles in determining the sentence to be imposed.

12. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

13. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

14. **Sentences: Records.** A sentencing court is not required to articulate on the record that it has considered each sentencing factor nor to make specific findings as to the facts pertaining to the factors or the weight given them.

15. **Sentences: Appeal and Error.** Whether a defendant is entitled to credit for time served and in what amount are questions of law, subject to appellate review independent of the lower court.

16. **Sentences.** When a court imposes multiple sentences contemporaneously, whether such sentences are ordered to be served consecutively or concurrently, all available credit for time served under Neb. Rev. Stat. § 83-1,106(1) (Reissue 2024) is applied just once, to the aggregate of all terms imposed.

Appeal from the District Court for Douglas County: Molly B. Keane, Judge. Affirmed.

Joseph L. Howard and Jason Wendling, Senior Certified Law Student, of Dornan, Howard, Breitkreutz, Dahlquist & Klein, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Melissa R. Vincent for appellee.

Pirtle, Welch, and Freeman, Judges.

Welch, Judge.

## I. INTRODUCTION

Patrick L. Wright appeals from his convictions and sentences for possession of a deadly weapon by a prohibited person, terroristic threats, and use of firearm to commit a felony. Wright argues that the district court erred in admitting certain evidence over his objections, in imposing excessive sentences, and in finding that Wright knowingly, intelligently, and voluntarily waived his right to counsel. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

### 1. Factual Background

On October 3, 2023, law enforcement officers Peter Miller and Andrew Woodard were dispatched to the area of North 21st and Pinkney Streets in Omaha, Nebraska, following a report from Jomo Graham that Wright approached him there in a red two-door Chevy Tahoe and pulled a firearm on him. While heading to the location described by Graham to the 911 emergency dispatch service, officers observed a vehicle matching the description heading northbound on Florence Boulevard from Ames Avenue, but the officers continued to the scene. After arriving at the scene, the officers contacted Graham, who was described as "acting very excited. With his speech, he was talking fast. He was animated with his motions."

Officer Miller testified that after a few minutes, Graham pointed "to the east towards Florence Boulevard and sa[id], that's him right there. At that point, I turn my direction to

where he's pointing and I see the same vehicle that Officer Woodard and I had saw at Florence Boulevard and Ames, a two-door Chevy 1500." Thereafter, Officers Logan Moran and Erin Riley, who recently arrived at the scene, began following the Chevy Tahoe. After making visual contact with the Tahoe, Officer Moran continued to follow it but was directed not to perform a traffic stop. Eventually, Officer Moran "disengage[d]" and other law enforcement officers in unmarked cruisers took over surveillance of the Tahoe. Multiple officers, including Sgt. Jacob Chong, Det. Andrew Ramsay, and Officer Kyle Graber, continued to follow the Tahoe until it cut through a parking lot and pulled over near North 61st and Jaynes Streets. At that time, the officers activated their cruiser lights. Sergeant Chong, Detective Ramsay, and Officer Graber all testified that the Tahoe's driver, identified as Wright, exited the Tahoe before they exited their cruisers, that Wright faced the officers' direction, and that Wright was holding a handgun and appeared to be attempting to pull it up. After alerting the other officers to the presence of a gun, Sergeant Chong fired numerous shots at Wright. Three other officers also discharged their firearms. At some point, Wright attempted to flee, and more shots were fired until Wright fell to the ground. Officers approached Wright, who had suffered multiple gunshot wounds and was lying on the ground. Multiple officers testified that upon approaching Wright, they observed a handgun a few feet away from Wright. After securing the firearm, officers began performing life-saving measures on Wright until paramedics arrived and transported Wright to a hospital. Video footage depicting this interaction was captured by multiple officers' body cameras and was admitted into evidence during the trial.

The forensic team was subsequently dispatched to photograph the scene and collect evidence. The Tahoe was transported to the police impound lot and was searched pursuant to a search warrant. Wright's handgun was collected as evidence, and upon investigation, forensics determined that there was a

bullet in the chamber of the gun and 10 additional rounds in the magazine.

The State charged Wright, in case number CR 23-5794, with possession of a deadly weapon by a prohibited person, a Class ID felony; terroristic threats, a Class IIIA felony; and use of a deadly weapon (firearm) to commit a felony, a Class IC felony. During the pretrial hearing, Wright specifically stated he wanted to proceed with his appointed trial counsel, and the matter was set for trial. Wright was represented by the public defender's office at all relevant times during this case.

## 2. Pretrial Motions

In September 2024, Wright's counsel filed a motion in limine and motion to exclude testimony from Graham because he could not be located for service of a subpoena and had indicated that he was not willing to participate in the proceedings. Counsel further sought to exclude statements made by Graham during the 911 call, statements made by officers over their radios in response to the 911 call, and statements made by Graham to police officers at the scene on the basis that the evidence was inadmissible hearsay and violated Wright's rights under the Confrontation Clauses in the Nebraska and U.S. Constitutions.

Following a hearing, the district court granted the motion to exclude Graham's testimony at trial. The court overruled the motion in limine relating to the statements made by Graham during the 911 call as nontestimonial excited utterances. As it related to the statements made by police over the police radio or dispatch, the court overruled Graham's motion, stating that the witnesses "shall be allowed to describe their understanding of the nature of the call to which they were responding without reference to the specific details of the allegations." The court found that the statements were not hearsay "as they are not being offered for the truth of the matter asserted, but rather for the effect the statements had on the listener(s)." As it related to statements made by Graham at the scene, the

district court sustained it in part, stating that "[s]pecifically, the State may elicit testimony regarding the statement made on scene that 'that's him right there' and . . . Graham's pointing to a specific vehicle. All other statements made on scene by . . . Graham are excluded as hearsay."

### 3. Trial

A jury trial was held in October 2024. During the trial, the parties stipulated that as of October 3, 2023, Wright was a prohibited person as defined by statute, having been previously convicted of a felony. Testimony was adduced from law enforcement officers, a 911 communications officer, and forensic investigators consistent with the facts as set forth above. Multiple exhibits were received during trial, including the recording of the 911 call; officers' body camera footage; photographs of the scene of the shooting and the location of the vehicles; and other photographs, including a screenshot of Wright from the body camera footage depicting Wright on the ground near the firearm, a closeup of the firearm and magazine, the Tahoe, various bullet holes, and the spent bullet casings at the scene.

### 4. Verdicts and Sentences

The jury found Wright guilty of the charged offenses of possession of a deadly weapon by a prohibited person, terroristic threats, and use of a firearm to commit a felony.

In December 2024, a consolidated sentencing hearing was held during which the court imposed sentences in the instant case and district court case No. CR 23-5393. In case No. CR 23-5393, Wright was convicted of two counts of possession of fentanyl with the intent to deliver and the court sentenced Wright to 5 to 10 years' imprisonment on each conviction with the sentences ordered to run concurrently.

In the current case, for Wright's conviction of possession of a firearm by a prohibited person, the district court sentenced Wright to 10 to 16 years' imprisonment with a mandatory minimum of 3 years; for Wright's conviction of terroristic

threats, the district court sentenced Wright to 1 to 2 years' imprisonment; and for Wright's conviction for use of a deadly weapon to commit a felony, the district court sentenced Wright to 10 to 14 years' imprisonment with a 5-year mandatory minimum. The sentences were ordered to run consecutively to one another and consecutively to his sentence in CR 23-5393. Wright was given a total of 443 days of credit for time served, with 431 days applied to CR 23-5393 and 13 days applied to the present case, CR 23-5794.

Wright has now timely appealed from his convictions and sentences, represented by different counsel on appeal.

## III. ASSIGNMENTS OF ERROR

Wright assigns in his appellate brief that the district court erred in (1) admitting Graham's statements to dispatch during the 911 call and statements to police identifying Wright once police arrived at the scene on the basis that the statements constituted testimonial hearsay; (2) admitting cumulative, inflammatory, and prejudicial photographic evidence, including graphic images of the scene, shell casings, and the firearm, over his objections; (3) imposing excessive sentences; and (4) finding that he knowingly, voluntarily, and intelligently waived his right to counsel.

We note that at the beginning of oral argument in this case, Wright's attorney orally moved to withdraw assignments of error Nos. 2 and 4, which request we granted. Therefore, those two assignments will not be discussed further in this opinion.

## IV. STANDARD OF REVIEW

[1] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Montoya*, 305 Neb. 581, 941 N.W.2d 474 (2020).

[2] Apart from rulings under the residual hearsay exception, we review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the

court's ultimate determination to admit evidence over a hearsay objection. *Id.*

[3] An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error. *Montoya, supra.*

[4] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Sutton*, 319 Neb. 581, 24 N.W.3d 43 (2025).

[5] It is within the discretion of the trial court to impose consecutive rather than concurrent sentences for separate crimes. *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017).

## V. ANALYSIS

### 1. ADMISSION OF TESTIMONIAL HEARSAY EVIDENCE

Wright first assigns that the district court erred in admitting statements made by Graham in his 911 call and in his identification of Wright to officers at the scene. We will discuss the assignments separately.

### (a) Graham's Statements During 911 Call

#### (i) Hearsay

Wright first argues that the district court erred in admitting Graham's statements made to dispatch during his 911 call because the statements constituted inadmissible hearsay. Wright's minimal argument was that Graham's out-of-court statements were offered for their truth and that no hearsay exception applies. The State argues that Wright's argument was insufficient to present the assignment. Assuming without deciding that the minimal argument was sufficient, we will address it.

Under Neb. Rev. Stat. § 27-801(3) (Cum. Supp. 2024), hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to

prove the truth of the matter asserted. Hearsay is not admissible except as provided by the rules of evidence, by other rules adopted by the statutes of the State of Nebraska, or by the discovery rules of this court. Neb. Rev. Stat. § 27-802 (Cum. Supp. 2024).

Neb. Rev. Stat. § 27-803 (Cum. Supp. 2024) provides numerous exceptions to the hearsay rule. One such exception is § 27-803(2), which excepts from the general hearsay rule "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The district court ruled that Graham's statements during the 911 call constituted excited utterances.

[6,7] For a statement to qualify as an excited utterance, the following criteria must be met: (1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant while under the stress of the event. *State v. Hembertt*, 269 Neb. 840, 696 N.W.2d 473 (2005). The key requirement is spontaneity, which requires a showing the statements were made without time for conscious reflection. *Id*.

Wright contends that Graham's statements during the 911 call identified Wright by name and alleged that Wright pointed a firearm at Graham. He argues that the court erred in admitting Graham's statements to dispatch during the 911 call because the statements constituted hearsay and were not harmless because "Graham's account was central to establishing intent and the credibility of the terroristic threats allegation." Brief for appellant at 14.

The district court found that the statements made by Graham during the 911 call were nontestimonial excited utterances. During the trial, the 911 call was played, wherein Graham stated, "[I] got a gun pulled on me, I'm on 21st and Pinkney." He stated that somebody just drove past him in "a red Chevy. It's a two-door Chevy, so it had to be, like, a old school Tahoe or something, you know? But the first part of the license plate

was YSU." Graham continued, stating that "they pulled a gun out on me and I was just standing outside." When asked where the individuals went when they left, Graham stated, "When they left [here,] I know where they going. They going up on 52nd and Ja[yn]es." The call continued as follows:

DISPATCH: Okay. And are you injured at all? Do you need an ambulance?

MR. GRAHAM: No. I'm not injured, but I was just standing outside with my dog and they drove past and stopped and pulled a gun out on me.

DISPATCH: Okay. And the —

MR. GRAHAM: And I know the dude who pulled the gun on me. His name is Patrick Wright.

DISPATCH: Okay. Is he white, Black, Hispanic?

MR. GRAHAM: The dude who pulled the gun out on me name is Patrick Wright.

DISPATCH: Is Patrick white, Black, Hispanic?

MR. GRAHAM: Wright. Wright. He's Black. Wright.

DISPATCH: Okay. And about how old is he?

MR. GRAHAM: Wright. W-R-I-G-H-T.

DISPATCH: Okay. How old is he?

MR. GRAHAM: Yes. He is mid-thirties, maybe. It was him and one other dude. I don't know who was in the back. I just seen him and the passenger. But when he rolled up, he pulled a gun out and pointed it at me and I'm standing outside, you know, and —

DISPATCH: What address are you at right now?

MR. GRAHAM: Like, my life could have been over right then.

Graham further indicated that he knew exactly where Wright lived and that he was riding in a "red Chevy, two-door SUV with . . . gray things around the wheel well."

We agree that the statements in the 911 call contained hearsay. Graham's statements that Wright pulled up in a red Chevy sport utility vehicle and pointed a gun at him were offered to prove the truth of those statements. Because Graham did not

testify at the trial, the 911 call was the only evidence admitted at trial to support Wright's convictions for terroristic threats and use of a weapon to commit a felony.

However, the statements themselves were properly admitted if they fall under an exception to the hearsay rule. Following our review of the record, we agree with the district court that all three elements of the excited utterance hearsay exception were met here. First, there is no doubt that Graham experienced a startling or shocking event in that a firearm was pointed at him. His statement to dispatch indicating that Wright pulled up in a "red Chevy, two-door SUV" and pointed a firearm at him related to that startling event. And, that statement was made shortly after the startling event occurred while Graham was still under the stress of the event, as evidenced in his voice. See *State v. Roebuck*, 31 Neb. App. 67, 976 N.W.2d 218 (2022) (holding that call to dispatch met all elements of excited utterance hearsay exception). Therefore, we agree that Graham's statements made during the 911 call were hearsay but were admissible under the excited utterance exception to the hearsay rule. This portion of Wright's assignment of error fails.

### (ii) Confrontation Clause

Wright next argues that the district court erred in admitting Graham's statements made to dispatch during the 911 call over his objections based on the Confrontation Clause.

[8] The Confrontation Clause, U.S. Const. amend. VI, which overlaps with the hearsay rules, provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Neb. Const. art. I, § 11, provides, in relevant part: "In all criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face . . . ." The Nebraska Supreme Court has held that the analysis under article I, § 11, is the same as that under the Sixth Amendment to the U.S. Constitution. *State v. Hembertt*, 269 Neb. 840, 696 N.W.2d 473 (2005).

[9,10] Where "testimonial" statements are at issue, the Confrontation Clause demands that such hearsay statements be admitted at trial only if the declarant is unavailable and there had been a prior opportunity for cross-examination. *Hembertt, supra*. In determining whether statements are testimonial for purposes of confrontation issues, the Nebraska Supreme Court, in relying on U.S. Supreme Court cases, stated:

> The inquiry is whether, under the circumstances, the declarant intended to bear testimony against the accused. The determinative factor in determining whether a declarant bears testimony is the declarant's awareness or expectation that his or her statements may later be used at a trial. . . . Thus, some excited utterances are testimonial and others are not, depending upon the circumstances in which the particular statement was made. . . . Under *Crawford*, statements obtained during police interrogations are testimonial fundamentally because police officers who obtain a statement during an interrogation are performing investigative and evidence-producing functions formerly handled by justices of the peace. *Kilday, supra*. Extension of this rationale indicates that a statement made at or near the scene of a crime may be an excited utterance, yet may also be testimonial under *Crawford* if obtained through questioning by a police officer acting in an investigative capacity to produce evidence in anticipation of a potential criminal prosecution. *Kilday, supra*.

> The underlying assumption in these cases is that a declarant responding to police questioning, structured and conducted for the purpose of producing evidence in anticipation of a potential criminal prosecution, should reasonably anticipate his or her testimony being used against the accused. . . . As the Court noted in *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), "testimony" is "'made for the purpose of establishing or proving some fact.' . . . An accuser who makes a formal statement to government officers

bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." In other words, whether a statement is testimonial depends on the purpose or expectation of the declarant in making the statement, and the circumstances surrounding the making of the statement illuminate the purpose or expectation of the declarant.

*Hembertt*, 269 Neb. at 850-51, 696 N.W.2d at 482-83 (citations omitted).

Wright specifically argues that Graham's statements during the 911 call were testimonial because they were made after the incident, while Graham was safe and in no imminent danger, and that the purpose was to provide a detailed account of the events for a law enforcement investigation, not to obtain emergency assistance.

In *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), the U.S. Supreme Court, in a consolidated case, considered whether statements made during a 911 call or at a crime scene were testimonial and thus subject to the requirements of the Confrontation Clause. The Supreme Court concluded that a 911 call made while the victim was facing an ongoing emergency was for the purpose of resolving the emergency and not to investigate events when she was describing the events as they were occurring. However, in the other case, the Supreme Court stated that statements made in response to law enforcement questions on the scene, when there was no immediate threat to the victim at that time, were for an investigatory purpose. The Supreme Court stated:

This is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot, as the Indiana Supreme Court put it, "evolve into testimonial statements," 829 N.E.2d, at 457, once that purpose has been achieved. In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove

away from the premises). The operator then told [the victim] to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, [the victim's] statements were testimonial, not unlike the "structured police questioning" that occurred in *Crawford*, 541 U.S., at 53, n. 4. . . .

Determining the testimonial or nontestimonial character of the statements that were the product of the interrogation in *Hammon* is a much easier task, since they were not much different from the statements we found to be testimonial in *Crawford*. It is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct—as, indeed, the testifying officer expressly acknowledged, App. in No. 05-5705, at 25, 32, 34. There was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything, *id.*, at 25. When the officers first arrived, [the victim] told them that things were fine, *id.*, at 14, and there was no immediate threat to her person. When the officer questioned [the victim] for the second time, and elicited the challenged statements, he was not seeking to determine (as in *Davis*) "what is happening," but rather "what happened." Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime— which is, of course, precisely what the officer *should* have done.

*Davis*, 547 U.S. at 828-30. The Supreme Court ultimately concluded:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and

that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 822.

However, the Supreme Court in *Michigan v. Bryant*, 562 U.S. 344, 363, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011), expounded on the definition of "ongoing emergency," stating that "whether an emergency exists and is ongoing is a highly context-dependent inquiry." The U.S. Supreme Court indicated that an ongoing emergency may exist, notwithstanding the fact that the threat to the victim has been neutralized, if the threat to first responders and the public continues. See *id*. The Court stated that when considering whether the evidence is testimonial for purposes of the Confrontation Clause, courts should consider all the relevant factors in determining whether, objectively, the "primary purpose" of the statements was to gather information to prove past events relevant to a later prosecution or were for the purpose of seeking assistance in ending a threatening situation. See *Bryant*, 562 U.S. at 370. The U.S. Supreme Court indicated that the factors to be considered in determining the primary purpose of the statements included whether there was an ongoing emergency, the formality of the questioning, the content of the questions and answers, the statements and actions of both the declarant and the interrogators, and the circumstances in which the interrogation occurred. See *Bryant, supra*. The Court further stated that in considering whether there was an ongoing emergency, courts should consider the possible threat to the victim, police, and the public; the type of danger posed; the nature of the dispute or the motive of the perpetrator; whether a weapon was utilized; whether the victim suffered injuries; whether the identity and location of the perpetrator are known by law enforcement; and whether the scene was secured. See *id*.

Further, as the U.S. Supreme Court held, "A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed

primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Davis v. Washington*, 547 U.S. 813, 827, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

Applying those principles here on this record, Graham's report to dispatch included a statement that Wright had just pointed a gun at him; that he remained at large, as demonstrated by the fact that he drove by the scene once police arrived and began questioning Graham at the scene; that under these circumstances, there remained a threat to the victim, the public, first responders, or all of them; that the type of danger involved a gun; that police were not aware of the location of the perpetrator at the time of the 911 call; and that there was a lack of formality to the questioning that suggested the police dispatcher's primary purpose was simply to address the ongoing emergency just described to the dispatcher. Because the circumstances of the call objectively indicate that the "primary purpose of the interrogation" was "to enable police assistance to meet an ongoing emergency," Graham's descriptions in the 911 call were not testimonial and did not bar their admission. See *Davis, supra*, 547 U.S. at 822. See, also, *U.S. v. Robertson*, 948 F.3d 912, 916 (8th Cir. 2020) (noting that court has previously held that "911 calls that are made to 'enable police to identify and apprehend an armed, threatening individual . . . [are] not testimonial in nature and thus d[o] not implicate the Confrontation Clause'").

### (b) Graham's Statements to Law Enforcement at Scene

Wright similarly contends that Graham's isolated statement made to law enforcement at the scene identifying Wright was testimonial hearsay that violated his right to confrontation. He asserts that Graham did not testify at trial and that Graham's testimony was excluded after the State was unable to serve him with subpoenas. Wright asserts that, despite Graham's not testifying during trial, Graham's statement was nonetheless

admitted during trial through a short video segment from Officer Miller's body camera footage at the scene. Wright argues that Graham's statement to law enforcement at the scene was testimonial because it was made after the incident, while Graham was safe and in no imminent danger, and that the purpose was to provide a detailed account of the events for a law enforcement investigation as opposed to obtaining emergency assistance.

As before, we first address Wright's contention that the statement offered and received constituted hearsay and whether any exception applied.

Here, during the trial, the State offered redacted body camera footage wherein, during the interaction with law enforcement, Graham pointed and "said, that's him right there." Officer Miller testified that Graham appeared to be acting "very excited," that he "was talking fast," and that "[h]e was animated with his motions." Officer Miller testified that during the conversation with Graham, "He seemed to be backing up a little bit. As he was saying it, he was pointing out. He got more excited as he was saying, that's him right there, that's him right there."

As before, we acknowledge that the statement made by Graham was offered for its truth but was provided by Graham to responding officers following his call to dispatch. Under similar circumstances, in *State v. Hale*, 290 Neb. 70, 73, 858 N.W.2d 543, 546 (2015), the Nebraska Supreme Court found that the declarant's statements to law enforcement that ""'[h]e did it"'" and pointing at the defendant were admissible as excited utterances. The court found that the statements were made after the declarant suffered and witnessed a startling event, that the statement identifying the perpetrator related to that event, and that despite differing testimony of the declarant's demeanor, the totality of the circumstances showed that the declarant was still under the stress from the assault when she identified the defendant as the perpetrator. Like Graham's statements to dispatch during the 911 call, we find

that Graham's statement identifying Wright to first responders met all three elements of the excited utterance hearsay exception. As such, the district court did not err in overruling Wright's objection related to the identification of Wright.

And in addressing Wright's claim that allowing the out-of-court statement violated the Confrontation Clause, we again conclude that the isolated statement was not testimonial. In short, Graham's statement was made while talking to police who first responded to his call, and the statement provided and received into evidence was not in response to a question by police. Graham simply recognized the vehicle while talking to police as the vehicle drove by the scene, and the fact that it returned underscores that the situation remained an ongoing emergency in that the person who allegedly brandished the gun had now returned. We find that the primary purpose here was directed at addressing an ongoing emergency and that Graham's identification was not testimonial when applying the principles we previously described. This assignment fails.

## 2. Excessive Sentences

Wright assigns that the district court imposed excessive sentences. Wright generally argues that the district court failed to appropriately weigh the sentencing factors and that the court should have imposed concurrent, rather than consecutive, sentences.

Here, Wright was convicted of possession of a deadly weapon by a prohibited person, a Class ID felony; terroristic threats, a Class IIIA felony; and use of a firearm to commit a felony, a Class IC felony. See, Neb. Rev. Stat. § 28-1206(1)(a) and (3)(b) (Cum. Supp. 2022) (possession of firearm by prohibited person); Neb. Rev. Stat. § 28-311.01 (Reissue 2016) (terroristic threats); Neb. Rev. Stat. § 28-1205(1)(a) and (c) (Cum. Supp. 2024) (use of firearm to commit felony).

Regarding Wright's conviction of possession of a deadly weapon by a prohibited person, Wright's sentence of 10 to 16 years' imprisonment with a mandatory minimum of 3 years'

imprisonment is within the statutory sentencing range for Class ID felonies, which are punishable by a mandatory minimum of 3 years' imprisonment and a maximum of 50 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2024).

Regarding Wright's conviction of terroristic threats, Wright was sentenced to 1 to 2 years' imprisonment, which is within the statutory sentencing range for Class IIIA felonies that are punishable by no minimum sentence and a maximum sentence of 3 years' imprisonment followed by 0 to 18 months' post-release supervision, a $10,000 fine, or both. Because Wright was consecutively sentenced to a Class IC felony and a Class ID felony, Wright was not subject to post-release supervision. See § 28-105(6).

Regarding Wright's conviction of use of a deadly weapon to commit a felony, Wright was sentenced to 10 to 14 years' imprisonment with a mandatory minimum of 5 years, which is within the statutory sentencing range for Class IC felonies that are punishable by a mandatory minimum of 5 years' imprisonment and a maximum of 50 years' imprisonment. See § 28-105.

[11-13] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles in determining the sentence to be imposed. *State v. Sutton*, 319 Neb. 581, 24 N.W.3d 43 (2025). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

[14] Wright does not dispute that the sentences are within the statutory sentencing range; rather, he argues that the court failed to consider the appropriate sentencing factors. The record refutes this claim. During the sentencing hearing, the district court stated that it had reviewed the presentence report, which included police reports, and had considered the relevant factors, including Wright's age, mentality, education and experience, social and cultural background, past criminal record or record of law-abiding conduct, motivation for the offense, the nature of the offenses, and the amount, if any, of violence involved in the commission of the offenses. We further note that a sentencing court is not required to articulate on the record that it has considered each sentencing factor nor to make specific findings as to the facts pertaining to the factors or the weight given them. *State v. Greer*, 309 Neb. 667, 962 N.W.2d 217 (2021).

According to the presentence report, Wright was 40 years old, single, and had three dependents. Wright has a 10th-grade education and was employed prior to his incarceration. Wright's previous criminal history included three convictions for operating a vehicle during suspension, as well as single convictions for providing false information, accessory to robbery, tampering with a witness, assault, third degree domestic violence assault, first degree trespassing, and other minor offenses. And after the current offenses, Wright was convicted of two counts of possession of fentanyl with the intent to distribute and was awaiting sentencing. The level of service/case management inventory assessed Wright to be at a very high risk to reoffend. Wright reported that he had been struggling with his mental health and had been diagnosed with anxiety and depression. He further reported that he had attempted suicide twice in his life. The probation officer noted that Wright's criminal record began at the age of 13 and that Wright had been affiliated with a gang when he was younger.

Based upon factors, including that the sentences imposed were within the relevant statutory sentencing ranges, Wright's

criminal history, his prior revocations of parole, his very high risk to reoffend, and the nature of the offenses, the sentences imposed were not an abuse of discretion. Further, the court's order that the sentences be served consecutively likewise does not constitute an abuse of discretion. Specifically, regarding Wright's conviction for use of a deadly weapon to commit a felony, § 28-1205(4) provides that "[a] violation of this section shall be treated as a separate and distinct offense from the underlying crimes being committed, and a sentence imposed under this section shall be consecutive to any other sentence imposed." This assignment of error fails.

[15,16] Although we find no error regarding Wright's assignment of error, we note that the district court determined that Wright had a total of 443 days of credit for time served. The court applied 431 days to Wright's sentence in CR 23-5393 and applied 13 days to Wright's sentence in the present case. Whether a defendant is entitled to credit for time served and in what amount are questions of law, subject to appellate review independent of the lower court. *State v. Nelson*, 318 Neb. 484, 16 N.W.3d 883 (2025). In *Nelson*, 318 Neb. at 499, 16 N.W.3d at 894, the Nebraska Supreme Court held that "when a court imposes multiple sentences contemporaneously, whether such sentences are ordered to be served consecutively or concurrently, all available credit for time served under [Neb. Rev. Stat.] § 83-1,106(1) [(Reissue 2024)] is applied just once, to the aggregate of all terms imposed." Accordingly, we modify the sentencing order to provide that Wright is entitled to 443 days of credit for time served against the aggregate of all terms imposed in the present case and CR 23-5393. We further direct the district court, upon spreading the mandate, to modify the commitment accordingly.

## VI. CONCLUSION

For the reasons stated above, we affirm Wright's convictions and sentences.

Affirmed.